**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

WILLIAM DOUGLAS FULGHUM, et al.,
individually and on behalf of all others
similarly situated,

*Plaintiffs,*

vs.

EMBARQ CORPORATION, et al.,

*Defendants.*

Case No. 07-2602-EFM

**MEMORANDUM AND ORDER**

TABLE OF CONTENTS

I.    Contractual Vesting Claims Under ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

      A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

            1.    Named Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

                  a.    Carolina Telephone & Telegraph Company  . . . . . . . . . . .  7

                  b.    United Telephone Companies . . . . . . . . . . . . . . . . . . . . . .  8

                  c.    Sprint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

            2.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

            3.    Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

B.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

C.      Defendants' Motions for Summary Judgment
        on Plaintiffs' Contractual Vesting Claims (Docs. 323, 332) . . . . . . . . . . . .   10

        1.      Summary Judgment Legal Standard . . . . . . . . . . . . . . . . . . . . . . . .   11

        2.      ERISA Contractual Vesting Law  . . . . . . . . . . . . . . . . . . . . . . . . .   12

        3.      Evidentiary Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

                a.      Magistrate Judge O'Hara's Sanction Order  . . . . . . . . . . . .   14

                b.      Course of Performance Evidence . . . . . . . . . . . . . . . . . . . . .   15

                c.      Defendants' Motion to Exclude the Report
                        and Testimony of Prof. Gail Stygall (Doc. 321) . . . . . . . . . .   16

        4.      The SPDs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

                a.      The First Group of SPDs (1 through 6, 18 and
                        24 through 32) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

                        1.      Language in the SPDs  . . . . . . . . . . . . . . . . . . . . . .   18

                                (a)     Language in SPDs 1 through 4  . . . . . . . . . .   18

                                (b)     Language in SPD 18  . . . . . . . . . . . . . . . . . .   19

                                (c)     Language in SPDs 5 and 6 . . . . . . . . . . . . . .   19

                                (d)     Language in SPDs 24 through 27
                                        and 29 through 31 . . . . . . . . . . . . . . . . . . .   20

                                (e)     Language in SPDs 28 and 32 . . . . . . . . . . .   20

                        2.      Discussion of the SPDs  . . . . . . . . . . . . . . . . . . . . .   21

                b.      The Second Group of SPDs (7 through 9) . . . . . . . . . . . . . .   26

                        1.      Language in these SPDs . . . . . . . . . . . . . . . . . . . . .   27

                        2.      Discussion of SPDs 7, 8, and 9  . . . . . . . . . . . . . . .   28

(a)    The SPDs do not contain
       affirmative, lifetime language  . . . . . . . . . . .   29

(b)    The SPDs contain termination
       provisions . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

3.    Discussion of Named Plaintiff Britt's Claim
      (SPD 7 and the 1984 CBA) . . . . . . . . . . . . . . . . . . .   33

c.    The Third Group of SPDs (10 through 12 and 19) . . . . . . . .   34

1.    Language in these SPDs . . . . . . . . . . . . . . . . . . . . . . .   35

2.    Discussion of these SPDs . . . . . . . . . . . . . . . . . . . . . .   37

(a)    The SPDs do not contain
       affirmative, lifetime language . . . . . . . . . . .   37

(b)    The SPDs contain a ROR clause
       and termination provisions . . . . . . . . . . . . . .   39

d.    The Fourth Group of SPDs (13 through 15 and
      20 through 23) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

1.    Language in these SPDs . . . . . . . . . . . . . . . . . . . . . . .   41

2.    Discussion of these SPDs . . . . . . . . . . . . . . . . . . . . . .   43

(a)    The SPDs do not contain
       affirmative, lifetime language . . . . . . . . . . .   43

(b)    The SPDs contain a ROR clause
       and termination provisions . . . . . . . . . . . . . .   44

e.    Named Plaintiff Clark's Claim (SPDs 16 and
      17 and the 1974 CBA) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

1.    Language in these SPDs and language
      in the CBA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

2.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

f.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

-3-

D.      Defendants' Motion to Decertify the Class Action (Doc. 285) . . . . . . . . . .   47

II.  Breach of Fiduciary Duty Claim Under ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

A.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

B.      Defendants' Motion for Summary Judgment on Breach of
        Fiduciary Duty Claim (Doc. 338) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

        1.      ERISA Fiduciary Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

        2.      Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

III.  Age Discrimination Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

A.      The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

        1.      Plaintiffs and the Collective Class . . . . . . . . . . . . . . . . . . . . . . . . .   59

        2.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

B.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

C.      Defendants' Motion for Summary Judgment on Plaintiffs'
        Age Discrimination Claims (Doc. 329) . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

        1.      Plaintiffs Cannot Establish a Prima Facie Case . . . . . . . . . . . . . . . .   63

        2.      Defendants Demonstrate That They Made Their
                Decision on Reasonable Factors Other Than Age . . . . . . . . . . . . . . .   65

D.      Defendants' Motion to Decertify Action (Doc. 287),
        Defendants' Motions to Exclude Terry Long and David
        Crawford Testimony (Docs. 325, 327), Plaintiffs' Motion
        for Advisory Jury (Doc. 333) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

E.      Plaintiffs' Request for Oral Argument on Defendants'
        Motions for Summary Judgment (Doc. 392) . . . . . . . . . . . . . . . . . . . . . . . .   70

Plaintiffs, on behalf of themselves, a certified class, and a certified collective class, bring suit alleging that Defendants' modification and elimination of retirees' medical, prescription drug, and life insurance benefits, violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and Ohio, Oregon, and Tennessee's anti-discrimination statutes.

In Plaintiffs' first claim, pursuant to ERISA section 502(a)(1)(B),[1] seventeen named Plaintiffs and an approximate 15,000 member class assert that the summary plan descriptions (SPDs) in effect when they retired, as well as other written documents and oral representations, give them a contractual right to vested health, prescription drug, and life insurance benefits. In Plaintiffs' third claim, they seek declaratory relief that they are entitled to the reinstatement of their benefits in the form in which they received them at retirement. These two claims overlap and are Plaintiffs' contractual vesting claims.

In Plaintiffs' second claim, pursuant to ERISA section 502(a)(3),[2] the seventeen named Plaintiffs allege that Defendants breached their fiduciary duty by misrepresenting the terms of the plans by affirmatively telling Plaintiffs, through SPDs, written communications, and oral statements, that their medical and life insurance benefits were lifetime benefits. Plaintiffs also contend that Defendants failed to inform them that their benefits could change.

In Plaintiffs' fourth claim, the seventeen named Plaintiffs, an additional 750 named individuals,[3] and an approximate collective class of 8,000 members, contend that Defendants

---

[1] 29 U.S.C. § 1132(a)(1)(B).

[2] 29 U.S.C. § 1132(a)(3).

[3] There are 750 named individuals in the Third Amended Complaint, referred to as the "individual age discrimination plaintiffs."

violated the ADEA when they reduced or eliminated Plaintiffs' life insurance benefits because it had a disparate impact upon older retirees. Plaintiffs' fifth, sixth, and seventh claims are identical to the ADEA discrimination claim except that they are brought under Ohio's, Oregon's, and Tennessee's age discrimination laws.

There are eleven pending motions before this Court. The Court will address these motions in three different sections and will set forth the applicable parties, facts, and law in each respective section.[4] In the first part of the Order, the Court will address Plaintiffs' contractual vesting claims under ERISA. This section includes: Defendants' Motion for Summary Judgment on the Named Plaintiffs' Contractual Vesting Claims (Doc. 323), Defendants' Motion for Summary Judgment on Selected Class Members' Contractual Vesting Claims (Doc. 332), Defendants' Motion to Exclude Gail Stygall Expert Testimony (Doc. 321), and Defendants' Motion to Decertify Class Action (Doc. 285).

In the second part of the Order, the Court will address the seventeen named Plaintiffs' breach of fiduciary duty claim under ERISA. This section includes Defendants' Motion for Summary Judgment on Plaintiffs' Breach of Fiduciary Duty Claim (Doc. 338).

In the third part of the Order, the Court will address Plaintiffs' age discrimination claims. This section includes: Defendants' Motion for Summary Judgment on Plaintiffs' Age Discrimination Claims (Doc. 329), Defendants' Motion to Decertify Collective Action (Doc. 287), Defendants' Motion to Exclude the Report and Testimony of Terry Long (Doc. 325), Defendants' Motion to Exclude the Report and Testimony of David L. Crawford (Doc. 327), Plaintiffs' Motion for

---

[4] There will be some duplication of the facts in the three sections.

Advisory Jury (Doc. 333), and Plaintiffs' Motion for Hearing on Defendants' Motions for Summary Judgment (Doc. 392).

## I. Contractual Vesting Claims under ERISA

In Plaintiffs' first and third claims (the contractual vesting claims), they allege that Defendants' reduction or elimination of their prescription drug, medical, and life insurance benefits violated ERISA because those benefits were vested. Plaintiffs seek a declaration that these benefits are vested under section 502(a)(1)(B) of ERISA and a restoration of those benefits.[5]

## A. The Parties

### 1. Named Plaintiffs

There are seventeen named Plaintiffs who are retired, long-term management and unionized employees of several regional and local telephone operating companies. All of these companies eventually became wholly-owned subsidiaries of Defendant Embarq Corporation upon its spin-off from Defendant Sprint Nextel Corporation in May 2006. As retired employees, Plaintiffs and their eligible spouses and dependents were participants in various ERISA-governed plans.

#### a. *Carolina Telephone & Telegraph Company ("CT&T") Plaintiffs*

Eleven named Plaintiffs retired from CT&T. Plaintiff Donald Clark retired from CT&T in August 1976. Plaintiffs James Britt and Laudie McLaurin retired from CT&T in approximately June 1985 and December 1988. Plaintiffs Willie Dorman and Calvin Joyner retired from CT&T in March 1994. Plaintiffs William Fulghum and William Daniel retired from CT&T in September 1996 and June 1999, respectively. Plaintiffs John Hollingsworth, Betsy Bullock, and William Games retired from CT&T in December 2001. Plaintiff Sue Barnes retired from CT&T in March 2003.

---

[5] 29 U.S.C. § 1132(a)(1)(B).

### b. *United Telephone Companies' Plaintiffs*

Five named Plaintiffs retired from United telephone companies. Plaintiff Robert King retired from United Telephone Company of Florida ("UTC-Florida") in September 1993. Plaintiffs Betty and Kenneth Carpenter retired from United Telephone Company of Ohio ("UTC-Ohio") in November 1997 and January 1998. Plaintiff Carl Somdahl retired from United Telephone Company of the Northwest ("UTC-NW") in January 1999. Plaintiff Wanda Shipley retired from United Inter-Mountain Telephone Company ("Inter-Mountain") in June 1999.

### c. *Sprint Plaintiff*

One Plaintiff, Timothy Dillon, retired from Sprint North Supply Company in approximately December 2002.[6]

## 2. Defendants

There are several companies that are named as Defendants. These include Defendant Sprint, formerly known as United Telecommunications, Inc. and Sprint Corporation; Defendant Embarq Corporation ("Embarq"); Defendant Embarq Mid-Atlantic Management Services Company, formerly known as Sprint Mid-Atlantic Telecom, Inc.; and Defendant CT&T, formerly a wholly-owned subsidiary of Sprint.

Numerous welfare benefit plans are named as Defendants. These include: Embarq Retiree Medical Plan, Sprint Retiree Medical Plan, Group Health Plan for Certain Retirees and Employees of Sprint Corporation, Sprint Welfare Benefit Plant for Retirees and Non-Flexcare Participants, Sprint Group and Long Term Disability Plans, Group Life Accidental Death and Dismemberment

---

[6] The Court notes that Plaintiff Dillon's retirement date of December, 2002 is an "uncontroverted fact" with respect to Defendants' Motion for Summary Judgment on Named Plaintiffs' Contractual Vesting Claims. The parties, however, disagree as to the timing of Dillon's retirement in Defendants' Motion for Summary Judgment on Plaintiffs' Breach of Fiduciary Duty Claims. The Court will discuss this issue in more detail in Section II (C)(2).

and Dependent Life Plan for Employees of Carolina Telephone and Telegraph Company, and

Carolina Telephone and Telegraph Company Voluntary Employees' Beneficiary Association

Sickness Death Benefit Plan ("VEBA") (collectively, "the Plans").

There are two additional defendants.  Defendant Employee Benefits Committee of Embarq

Corporation ("the Committee") is the administrator of the Plans sponsored by Embarq and CT&T.

Defendant Randall T. Parker served as Embarq's Director of Benefits between August 2005 and

March 2010 and as Sprint's Director - Benefits Strategy and Sprint Benefits Brand Management

between 1995 and August 2005.

**3. Class Members**

In early 2011, the Court certified a class with respect to the two contractual vesting claims.

The class definition as set forth in the class notice is as follows:

> The certified ERISA class includes retired employees and their eligible dependents
> who retired before January 1, 2008 from Embarq or a business that became part of
> Embarq and who were participating in any of the retiree medical, prescription drug
> and life insurance benefit plans of Sprint Nextel Corporation and Embarq
> Corporation.[7]

There is also sub-class which includes individuals who were participants in CT&T's Voluntary

Employee Benefits Association ("VEBA") plan.  This sub-class is known as the "VEBA sub-class."

There are approximately 15,000 ERISA class members.

---

[7] Doc. 210-1, p. 6.

## B.   Factual Background

In November 2005, Sprint announced that the prescription drug benefits for participants and beneficiaries who were eligible for Medicare Part D coverage would be modified such that each participant and beneficiary would receive $41.67 a month, or $500 a year, effective January 1, 2006.

On July 26, 2007, Embarq announced that (1) company-sponsored medical coverage and the prescription drug subsidy provided to Medicare-eligible retirees and Medicare-eligible dependents of retirees would be eliminated effective January 1, 2008; (2) basic life insurance coverage would be eliminated for retirees who were participants in the CT&T VEBA effective September 1, 2007; and (3) basic life insurance coverage would be capped at $10,000 for all other retirees effective January 1, 2008.

In late December 2007, Plaintiffs brought suit over the reduction and elimination of these benefits.

## C. Defendants' Motions for Summary Judgment on Plaintiffs' Contractual Vesting Claims (Docs. 323, 332)

In this case, the summary plan descriptions ("SPDs") explain Plaintiffs' and class members' medical and life insurance benefits.  Some of the SPDs address medical benefits,[8] some of the SPDs pertain to life insurance benefits,[9] and several of the SPDs address both medical and life insurance benefits in the same document.[10]  Plaintiffs rely upon language in these SPDs that their medical and life insurance benefits are vested lifetime benefits.

---

[8] These include SPDs 1 through 4; 10 through 12; 16; 18; and 19.

[9] These include SPDs 7 through 9; 13 through 15; 17; and 20 through 23.

[10] These include SPDs 5 and 6; and 24 through 32.

Defendants bring two summary judgment motions on Plaintiffs' and class members' contractual vesting claims. Defendants' first motion addresses the seventeen named Plaintiffs. There are seventeen SPDs at issue with respect to these Plaintiffs' contractual vesting claims. These include SPDs 1 through 17. Defendants' second summary judgment motion addresses certain class members that either fall under the same SPDs as the named Plaintiffs or fall under SPDs that contain similar language. There are fifteen SPDs at issue in Defendants' Motion for Summary Judgment on selected class members' contractual vesting claims. These include SPDs 18 through 32. Defendants group these thirty-two SPDs into five different groups based on the similarity of language contained within those SPDs. The Court will address each group of SPDs.

**1. Summary Judgment Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[11] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[12] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[13] To meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[14]

---

[11] Fed. R. Civ. P. 56(a).

[12] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[13] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[14] *Id.* (citing *Celotex*, 477 U.S. at 325).

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[15] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[16] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[17]

## 2. ERISA Contractual Vesting Law

There are two types of employment benefits under ERISA: welfare benefits and pension benefits.[18] In this case, these benefits are welfare benefits.[19] Welfare benefit plans do not have the same requirements as pension benefit plans.[20] That is, ERISA does not establish minimum participation, vesting, or funding requirements for welfare benefit plans.[21] Thus, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare benefit plans."[22] The exception to this rule is if an employer or other plan

---

[15] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[16] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[17] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[18] *See* 29 U.S.C. § 1002(1)-(2).

[19] *See* 29 U.S.C. § 1002(1). *See also* Pretrial Order, Doc. 295.

[20] *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

[21] *Id.*

[22] *Id.*

sponsor contractually agrees to grant vested benefits.[23]  An employer or plan sponsor "who changes the vested benefits granted in a welfare plan may be liable to a beneficiary under the plan."[24]

Plaintiffs bear the burden of showing an agreement or other demonstration of employer intent to vest welfare benefits.[25]  "Contractual vesting of a welfare benefit is an extra-ERISA commitment that must be stated in clear and express language. . . . [It] is a narrow doctrine."[26]  To determine whether a welfare benefit plan provides for vested benefits, the Court applies general principles of contract construction by looking at the contract language and considering the parties' intent.[27]  Only if the language is ambiguous does the Court consider extrinsic evidence.[28]  Otherwise, the Court construes the documents as a matter of law.[29]

Title 29 U.S.C., section 1022(b) requires that an SPD contain information about "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." Section 1022(a) requires that the SPD be "written in a manner calculated to be understood by the average plan participant," and it must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

An SPD is considered part of the plan documents required by ERISA. If the clause to be construed does not itself determine the plan sponsor's intent, we read the

---

[23] *See Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1510 (10th Cir. 1996), *abrogated on other grounds* by *CIGNA Corp v. Amara*, 131 S. Ct. 1866 (2011).

[24] *Id.* (citing 29 U.S.C. § 1132(a)(1),(3)).

[25] *Id.* at 1511.

[26] *Welch v. Unum Life Ins. Co.*, 382 F.3d 1078, 1086 (10th Cir. 2004) (internal quotation marks and citation omitted).

[27] *DeBoard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1240 (10th Cir. 2000).

[28] *Id.*

[29] *Chiles*, 95 F.3d at 1511.

-13-

language of the SPD as a whole. Because the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself.[30]

In this case, to determine the dispositive issue of whether Defendants intended to confer vested medical and life insurance benefits upon Plaintiffs, the Court must analyze provisions of the SPDs. In analyzing these provisions, the Court must first determine whether they are ambiguous. If they are unambiguous, the Court construes them as a matter of law.

**3. Evidentiary Issues**

Before discussing the language of these SPDs, the Court must address several evidentiary issues.

*a. Magistrate Judge O'Hara's Sanction Order*

In this case, the parties engaged in lengthy discovery, and there were numerous discovery disputes over the SPDs, collective bargaining agreements, and plan documents. One of the issues involved which party had the responsibility of identifying the SPDs applicable to each class member. On February 24, 2012, Magistrate Judge O'Hara found that Plaintiffs had failed to comply with a previous order requiring Plaintiffs to identify by group the retirees to which Plaintiffs' alleged plan documents applied. Because of Plaintiffs' failure to comply with his previous order, Judge O'Hara imposed a sanction precluding Plaintiffs from taking a position in the litigation inconsistent with Defendants' document-to-class-member mapping.[31] After Plaintiffs sought reconsideration of that order, Judge O'Hara upheld most of it, but clarified that his order did not apply to the seventeen named Plaintiffs because Plaintiffs had previously identified documents with respect to those named

---

[30] *Id.* at 1515.

[31] *See* Doc. 318. Defendants had identified the SPDs that they contended were applicable to each class member.

Plaintiffs.[32]  On May 24, 2012, this Court denied Plaintiffs' Motion to Review Magistrate Judge's February 24, 2012 and March 27, 2012 Orders and upheld the sanction.[33]  Thus, Plaintiffs cannot now take a position inconsistent with Defendants' identification of the SPDs applicable to the selected class members.

### b.  Course of Performance Evidence

Plaintiffs argue that "course of performance" evidence—consisting of alleged oral statements from company representatives to Plaintiffs, internal company documents, and written checklists and letters provided to Plaintiffs—demonstrates Defendants' intent to provide lifetime benefits.  All of this "course of performance" evidence is extrinsic evidence.  Only if the plan language is ambiguous does the Court need to consider this evidence.[34]  For the reasons discussed below,  the Court finds that the language in the SPDs is unambiguous.  Thus, the Court will not consider the extrinsic evidence in relation to Plaintiffs' contractual vesting claim.[35]

---

[32] *See* Doc. 349.

[33] *See* Doc. 387.

[34] *See DeBoard*, 208 F.3d at 1240 (noting that if the plan language is ambiguous, the court may look at extrinsic evidence); *Chiles*, 95 F.3d at 1519 n. 12 (noting that the district court may consider "interpretive statements . . . , past practices, customary usage in the trade, and other competent evidence bearing on the understanding of the parties" when interpreting an ambiguous provision); *see also Kerber v. Qwest Pension Plan*, 572 F.3d 1135, 1149-50 (10th Cir. 2009) (finding that the district court "properly refused to consider the extrinsic evidence offered by plaintiffs" when the plaintiffs failed to identify ambiguities in the plan).

[35] The Court, however, will set forth some of this evidence with respect to Plaintiffs' breach of fiduciary duty claim.

-15-

### c. Defendants' Motion to Exclude the Report and Testimony of Professor Gail Stygall (Doc. 321)

Plaintiffs also attempt to rely upon expert testimony from Gail Stygall, Ph.D., a professor of English and Linguistics, in which she opines, in part, that due to the language of the SPDs, they are ambiguous and "reasonably susceptible to the reader's conclusion that lifetime benefits have been promised."[36] Defendants filed a Motion to Exclude the Report and Testimony of Professor Gail Stygall. The determination of whether language in a contract is ambiguous is a question of law.[37] As explained below, there are numerous court decisions regarding contractual vesting claims. In every one of these decisions, the court makes the determination as to whether or not the language in the contract is ambiguous—the court does not rely on an expert's opinion for this conclusion.

In this case, because the Court must determine whether the contractual language is ambiguous as a matter of law, Professor Stygall's opinion is irrelevant and unnecessary to the Court's determination, and the Court will not consider her opinion. Accordingly, the Court grants Defendants' Motion to Exclude the Report and Testimony.

### 4. The SPDs

As noted above, Defendants group thirty-two SPDs into five different groups based on the similarity of language contained within those SPDs. The first group of SPDs contains at least one reservation of rights ("ROR") clause providing that the company may amend or terminate the plan at any time. This first group of SPDs also contains a provision that coverage will end upon death. The second group of SPDs does not contain an express ROR. Nor does it contain such provisions

---

[36] See generally Plaintiffs' facts regarding Gail Stygall's expert report and Ms. Stygall's expert report.

[37] *See Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1212 (10th Cir. 2002). *See also Chiles*, 95 F.3d at 1511 ("In interpreting the terms of an ERISA plan [the court] examine[s] the plan documents as a whole and, if unambiguous, [the court] construe[s] them as a matter of law.").

that coverage will end upon death. The third and fourth groups of SPDs contain no express language indicating that benefits are vested and contain a reservation of rights clause premised on business necessity. The final group contains only two SPDs, and they are only applicable to named Plaintiff Clark. The Court will address each group of SPDs in turn.

### a. The First Group of SPDs (1 through 6, 18, and 24 through 32)

This first group of sixteen SPDs are substantially similar in that they contain at least one ROR stating that the company reserves the right to amend or terminate the plan at any time. They also contain the statement that the retirees' benefit coverage ends upon the retirees' death. These SPDs include 1 through 6, 18, and 24 through 32.

Thirteen named Plaintiffs base their claims for medical benefits on SPDs 1 through 6.[38] An additional 4,513 class members retired while SPDs 1 through 6 were in effect. SPD 18 is substantially similar to SPDs 1 through 4, and SPDs 24 through 32 are substantially similar to SPDs 5 and 6. A total of 6,108 selected class members retired while these SPDs 18 and SPDs 24 through 32 were in effect.[39]

---

[38] Named Plaintiffs Fulghum, Dorman, King, Joyner, and the Carpenters contend that SPD 1 was in effect when they retired, and that their medical benefits vested under the terms of that SPD. An additional 1,886 class members retired while SPD 1 was in effect.

Named Plaintiff Daniel contends that his medical benefits vested under SPD 2. An additional 613 class members retired while SPD 2 was in effect.

Named Plaintiff Somdahl contends that SPDs 3 and 4 were in effect when he retired, and his medical benefits vested under the terms of these SPDs. An additional 1,030 class members retired while SPD 4 was in effect.

Named Plaintiffs Hollingsworth, Bullock, Games, and Dillon contend that their medical benefits vested under SPD 5. Plaintiff Dillon relies on SPD 5 for his claim of vested life insurance benefits as well. An additional 984 class members retired while SPD 5 was in effect.

Named Plaintiffs Hollingsworth, Bullock, and Games contend that their life insurance benefits vested under the terms of both SPD 5 and SPD 9.

Named Plaintiff Shipley contends that his medical and life benefits vested under the terms of SPD 6.

[39] No named Plaintiffs rely upon SPD 18 or SPDs 24 through 32.

***1. Language in the SPDs***

    ***(a)  Language in SPDs 1 through 4***

SPDs 1 through 4 are medical SPDs.  They all include sections entitled "When Coverage Ends."  Under the "Retirees" section, it provides:

> Your coverage under the Retiree Medical Plan ends
> - when you die, or
> - you do not pay your share of the cost of your coverage.

In a section entitled "Answering Your Needs," these plans provide that "[b]y participating in the United Telecom Retiree Medical Plan, you can feel secure that your family's health and well-being will be protected after you stop working."  SPDs 1 through 4 also includes ROR provisions. On the first page of each of these SPDs, there is language explaining that the document is a summary plan description of the medical plan which states:

> The company expects to continue the Retiree Medical Plan indefinitely. However, the company reserves the right to amend or terminate this plan, or any statement made in this summary plan description, at any time.

Other language in the Plans, at various places, indicate that coverage could change in the future.  For example, in a section entitled "What the Plan Covers," it states that "[j]ust as medical coverage can change in the future for active employees, so can the coverage that is available to retirees."

SPDs 1, 2, and 4 include a "Legal Information" section.[40]  In this section, under the heading "The Plans' Future," it provides that the company intends to continue providing benefits, but it reserves the right to amend the Plan, change the method of providing benefits, or terminate the Plan.

---

[40] SPD 3 does not contain a "Legal Information" section.

### (b)  Language in SPD 18

SPD 18 is also a medical SPD and similar to SPDs 1 through 4.  SPD 18, however, only contains one ROR clause. It is located at the end of the Table of Contents.  It provides: "Embarq intends to continue the Retiree Medical Plan. However, the Company reserves the right to change or discontinue any or all benefits under these options, or any statement in this summary plan description, at any time."

### (c)  Language in SPDs 5 and 6

SPDs 5 and 6 are similar to SPDs 1 through 4.  The main distinction between them is that SPDs 5 and 6 cover *both* medical and life insurance benefits, while SPDs 1 through 4 only cover medical benefits.

SPDs 5 and 6 include sections in the medical portion of the Plan entitled "When Coverage Ends." Under the Retiree section, it provides:

> Your coverage under the Retiree Medical Plan ends when:
> - you die, or
> - you do not pay your share of the cost of your coverage.

They also include a section in the life insurance portion of the Plan entitled "When Does Coverage End" which provides that "[t]he basic life insurance coverage ends on the date of your death."

SPDs 5 and 6 also include several ROR provisions.  On the first page of both of these SPDs, there is language explaining that the document is a summary plan description of retiree benefits which states:

> The company expects to continue the Retiree Benefits indefinitely. However, the company reserves the right to amend or terminate this plan, or any statement made in this summary plan description, at any time.

Other language throughout the SPDs indicates that coverage could change in the future and that the company may change or terminate coverage.

SPD 5 has a "Legal Information" section.  In the "the Plans' Future" section, it provides that the company intends to continue providing benefits, but "it  reserves the right to amend any of the plans, to change the method of providing benefits, or to terminate any or all of the plans.  You'll be notified of any changes."  SPD 6 does not have this "Legal Information" section.

### (d)  Language in SPDs 24 through 27 and SPDs 29 through 31

SPDs 24 through 27 and 29 through 31 are substantially identical to SPDs 5 and 6.[41]  They state that coverage ends when the recipient dies.  They also include a general ROR clause at the beginning of the SPDs, language throughout the SPDs indicating that coverage could change in the future, and a "Legal Information" section which includes an additional ROR clause.

### (e)  Language in SPDs 28 and 32

SPD 28 and SPD 32 are also similar to SPDs 5 and 6.[42]  They include the provision that coverage ends upon death.   SPD 28 and SPD 32, however, only contain one ROR clause.  The clause is located on the Table of Contents page and provides: "[The Company][43] intends to continue the Retiree Medical Program.  However, the Company reserves the right to change or discontinue any or all benefits under these options, or any statement in this summary plan description, at any time."

---

[41] These SPDs also cover both medical and life insurance benefits.

[42] SPD 28 and 32 cover both medical and life insurance benefits.

[43] One SPD references Sprint Nextel, and one SPD references Embarq.

### 2. Discussion of the SPDs

Defendants contend that the named Plaintiffs and selected class members relying on these SPDs cannot demonstrate that Defendants intended to provide vested medical and life insurance benefits because: (1) although these SPDs state that coverage ends "when you die," that language is insufficient to demonstrate vested lifetime benefits; and (2) even if the language could be construed as a promise of lifetime benefits, the same SPDs state that the company reserves the right to change or terminate benefits at any time.  Plaintiffs disagree and state: (1) the "when you die" provisions in the SPDs demonstrate that they are entitled to lifetime benefits, and (2) even if the "when you die" language does not establish benefits for life, that language is in conflict with the ROR clause, rendering the SPDs ambiguous.  Plaintiffs then contend that if the SPDs are ambiguous, the Court must consider extrinsic evidence to determine whether Defendants intended to provide vested benefits.

In *Chiles v. Ceridian Corp.*, the Tenth Circuit discussed the difficulty of making the determination of whether welfare benefits vested under an ERISA plan when the plan contains both an ROR provision and a promise of lifetime benefits.[44]  At the time *Chiles* was decided, the Third, Fourth, and Eighth Circuits had addressed the same issue.[45]  The Tenth Circuit noted that in cases

---

[44] 95 F.3d at 1511-13.

[45] *See In re Unisys Corp. Retiree Medical Benefit ERISA Litig. (Unisys I)*, 58 F.3d 896, 903-04 (3d Cir. 1995) (finding that although the plan promised lifetime benefits, the broad and unequivocal reservation of rights clause was unambiguous and allowed the employer to terminate benefits at any time); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 856 (4th Cir. 1994) (finding that the express reservation of rights clause providing that the employer could modify or terminate participant's benefits defeated the plaintiffs' claim that the company intended to provide vested benefits); *Howe v. Varity Corp.*, 896 F.2d 1107, 1109 (8th Cir. 1990) (noting that a plaintiff failed to meet his burden in demonstrating vested lifetime benefits when the employer expressly reserved the right to amend or terminate the plan).  *But see Jensen v. Sipco, Inc.*, 38 F.3d 945, 950 (8th Cir. 1994) (finding that although reservation of rights clauses are generally inconsistent with a claim for vested benefits, the two reservation of rights provisions at issue left "at least some doubt" as to whether the defendant had the right to change benefits to retired individuals).

in which SPDs contained both a ROR clause and a promise of lifetime benefits, the weight of case authority supports the approach "that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits."[46]   In *Chiles*, however, the Tenth Circuit found it unnecessary to adopt a "hard-and-fast rule" that a general reservation of rights clause unambiguously controlled a promise of lifetime benefits found elsewhere in the same ERISA document because it found that the plan language allowed the employer the right to change benefits.[47]   Since the Tenth Circuit's decision in *Chiles*, four additional circuits have determined that retirees' benefits were not vested because the same document indicating lifetime benefits also contained an unambiguous reservation of rights provision allowing the employer to terminate or change the plan at any time.[48]

Plaintiffs nevertheless argue that the language in the SPDs stating that their benefits will end only "when [they] die" is sufficient to indicate an intent on the part of Defendants to provide lifetime benefits.  Plaintiffs rely upon a Tenth Circuit case, *DeBoard v. Sunshine Mining & Refining Co.*,

---

[46] *Chiles*, 95 F.3d at 1512 n. 2.

[47] *Id.* at 1512.

[48] *See Vallone v. CNA Fin. Corp.*, 375 F.3d 632, 634 (7th Cir. 2004) (stating that "the 'lifetime' nature of a welfare benefit does not operate to vest that benefit if the employer reserved the right to amend or terminate the benefit."); *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 99 (2d Cir. 2001) ("Because the same document that potentially provided the 'lifetime' benefits also clearly informed employees that these benefits were subject to modification, we conclude that the language contained in the [ ] SPD is not susceptible to an interpretation that promises vested lifetime life insurance benefits."); *Spacek v. Maritime Ass'n*, 134 F.3d 283, 293 (5th Cir. 1998) (noting that in the ERISA welfare benefit context, most cases recognize that "a general amendment provision in a welfare benefits plan is of itself sufficient to unambiguously negate any inference that the employer intends for employee welfare benefits to vest contractually, and thus become unalterable, after the employee retires."), overruled on other grounds in *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998) (finding no ambiguity in a plan that contained both a promise for lifetime coverage and a reservation of rights clause allowing the employer to amend or terminate the plan and therefore determining that the plaintiffs' benefits were not vested).

for this proposition.[49]  In *DeBoard*, the employer sent letters to employees informing them of an early retirement program.[50]  The letter stated that employees who chose to participate in early retirement "would be entitled to receive health care . . . [at the employer's] expense until the time of your death."[51]  The letter also contained specifics as to how the plan worked.[52]  The Tenth Circuit found that this letter constituted a new benefit plan, not previously in existence, for early retirees.[53]  Accordingly, the Tenth Circuit looked to the terms in that letter to determine whether plaintiffs' rights were vested.[54]

Although the Tenth Circuit found in *DeBoard* that the plaintiffs' rights were vested under the plan, the facts in this case are distinguishable. In *DeBoard*, the new benefit plan promising benefits until death did not include a reservation of rights clause.  Nor did the new benefit plan contain any language indicating that the employer could terminate or change the plan at any time. In addition, the Tenth Circuit determined that even if they read the letter to incorporate a reservation of rights clause from the employer's other plan documents, the reservation of rights provision was ambiguous as to whether the employer had the right to terminate or make changes to the plan.[55]  Those facts are not present in this case.  The document that contains language indicating that benefits are available until Plaintiffs' deaths also contains several reservation of rights provisions

---

[49] 208 F.3d 1228 (10th Cir. 2000).

[50] *Id.* at 1232-33.

[51] *Id.* at 1233.

[52] *Id.* at 1238-39.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 1240.

explicitly stating that the company can terminate or change the plan at any time. Furthermore, it is

unambiguous as to whom could discontinue or terminate the plan. The SPDs state that the company

reserves the right to discontinue the plan at any time. Thus, the language in the SPDs at issue differs

from the language in *DeBoard*.[56]

The language in Plaintiffs' SPDs is more akin to language that other circuits have found non-

indicative of vested lifetime benefits. In *Crown Cork & Seal Co. v. Int'l Association of Machinists*,[57]

the Eight Circuit considered language in an SPD that provided that coverage continued "until your

death."[58] The Eight Circuit determined that this language was not "explicit vesting language, and

in any case, it is inconsistent with the reservation-of-rights clause . . . which controls."[59] And the

Third Circuit has held that "[a]n employer who promises lifetime medical benefits, while at the same

time reserving the right to amend the plan under which those benefits were provided, has informed

---

[56] Plaintiffs also rely on the Tenth Circuit's unpublished opinion of *Aguilar v. Basin Res., Inc*., 47 F. App'x 872 (2002), for the proposition that a promise of benefits "for life" or "until death" indicates an intent to vest those benefits. In *Aguilar*, the Tenth Circuit interpreted a coal wage collective bargaining agreement. *Id.* at 873. The court determined that the agreement was ambiguous because it contained numerous statements that benefits would continue "for life" or "until death" but also stated several times that health benefits would continue "during the term of 'this' agreement." *Id.* at 875. Thus, the court found it appropriate for the district court to consider extrinsic evidence to determine whether the defendant intended to provide lifetime benefits. *Id.*

The Tenth Circuit's opinion in *Aguilar* is distinguishable and not applicable to the facts of this case. First, the collective bargaining agreement was based on National Bituminous Coal Wage Agreements, the subject of numerous court cases with respect to whether the agreements guaranteed lifetime health benefits to retired coal miners. *Id.* at 875 and n. 4. Furthermore, there is only one reference in the SPD that benefits may continue until death, in contrast to the numerous references of lifetime benefits in the collective bargaining agreement in *Aguilar*. Finally, the collective bargaining agreement in *Aguilar* did not contain a reservation of rights clause, while the SPDs here include reservation of rights provisions allowing the company to amend or terminate benefits at any time.

[57] 501 F.3d 912 (8th Cir. 2007).

[58] *Id.* at 918. This language was included in the SPD's "Termination of Coverage" section.

[59] *Id. See also Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 61 (2d Cir. 2006) (determining that although the plan listed death as a circumstance in which benefits could be terminated, the SPD did not contain any affirmative lifetime language indicating an intent to vest lifetime benefits); *Sengpeil v. B.F. Goodrich Co.*, 156 F.3d 660, 668 (6th Cir. 1998) (finding that language in the plan "providing that a retiree's spouse will continue to receive benefits after the retiree dies 'until death or remarriage'" fell "far short of expressing a clear intent to render such benefits 'forever unalterable' ").

-24-

plan participants of the time period during which they will be eligible to receive benefits *provided* the plan continues to exist."[60]

Plaintiffs complain that the reservation of rights clause is not cross-referenced in any section, does not appear with a heading or a warning, and is not listed in the Table of Contents. Thus, Plaintiffs assert that allowing Defendants to change or terminate the plan adds language to the "When Coverage Ends" section. The Court disagrees. In all of the SPDs at issue in this section of the Court's order, the ROR clause, even if there is only one, appears either next to the Table of Contents or on the first page of the SPD. In the SPDs in which only one reservation of rights clause appears, it is in bold on the Table of Contents page. The placement of these RORs does not render them obscure, and the Court must read the SPDs as a whole.[61] Furthermore, not allowing Defendants to amend or terminate the plans or benefits under the plans eliminates the stated right to do so and would render the inclusion of the reservation of rights clause meaningless and leave it without effect.[62]

Plaintiffs also argue that the statement in SPDs 1 through 4 that retirees who participate in the plan "can feel secure that your family's health and well-being will be protected after you stop working" is an express assurance of life-long retirement security. The Court disagrees that this statement can be read as an intent to provide unalterable lifetime benefits. The statement simply

---

[60] *Unisys I*, 58 F.3d at 904.

[61] The Court finds it unnecessary to address the parties' disagreement over the timing of the enactment of several rules in the Code of Federal Regulations.

[62] *See Chiles*, 95 F.3d at 1513 (stating that plaintiffs' interpretation of the plan "would render the termination exception superfluous").

explains that retirees can participate in the plan once they are retired.  It must be read in conjunction with the reservation of rights clause allowing Defendants to amend or terminate the plan *at any time*.

In sum, the same document that purports to promise lifetime benefits also contains an unambiguous reservation of rights clause which clearly sets forth that Defendants could amend or terminate benefits at any time.   Accordingly, the Court grants summary judgment to Defendants with respect to the contractual vesting claims of the Named Plaintiffs and Selected Class Members covered by SPDs 1 through 6, 18, and 24 through 32.

### b. The Second Group of SPDs (7 through 9)

The second group of three SPDs are life insurance SPDs.  The language in each of the three SPDs is substantially similar. Unlike the SPDs discussed above, these life insurance SPDs do not contain an express reservation of rights provision.  Nor do they contain any express statement that coverage ends upon death.

Named Plaintiff Britt contends that his life insurance benefits vested under SPD 7.[63]  Named Plaintiff Britt, however, also relies on a collective bargaining agreement in effect when he retired. Because Britt relies on both SPD 7 and a collective bargaining agreement, the Court will discuss Britt's claim separately below in Section I(4)(b)(3).  Named Plaintiff Barnes relies on SPD 8 for her claim of vested life insurance benefits.[64]  Named Plaintiffs Fulghum, Daniel, Dorman, Joyner, and McLaurin rely on SPD 9.[65]  Named Plaintiffs Hollingsworth, Bullock, and Games base their claim

---

[63] 185 selected class members retired while SPD 7 was in effect.

[64] 813 selected class members retired while SPD 8 was in effect.

[65] 1,207 selected class members retired while SPD 9 was in effect.

for vested life insurance benefits on SPDs 5 and 9. A total of 2,205 selected class members retired while SPDs 7 through 9 were in effect.

### 1. Language in these SPDs

The pertinent provisions in these life insurance SPDs are as follows.  A section entitled "Benefits for You" states:

> If you are an Employee who is retired on pension on or after June 1, 1981, and you were insured as an Active Employee for contributory insurance under the Group Policy, or the Group Policy replaced on June 1, 1981, for the full time after your forty-fifth birthday that you were eligible for such insurance, the amount of your Life Insurance during the first five years following the date of your retirement *will be* an amount equal to the amount of your Life Insurance on the day preceding the date of your retirement. On the fifth anniversary of the date of your retirement the amount of your Life Insurance *will automatically reduce* to the greater of (a) one-half of the amount of Life Insurance applicable to you prior to such fifth anniversary, and (b) $1,500.[66]

> If you retired on or after September 1, 1965, but before June 1, 1981, your Life Insurance will be that amount, if any, applicable to you under the Group Policy on May 31, 1981, and, if the fifth anniversary of the date of your retirement is on or after June 1, 1981, will be subject to the reduction set out in the preceding paragraph on the fifth anniversary of the date of your retirement.

> If you retired prior to September 1, 1965, your Life Insurance on June 1, 1981, will be that amount, if any, applicable to you under the Group Policy on May 31, 1981.

A section entitled "When Your Insurance Ends" states:

> Your insurance under the Group Policy will end on the earliest of the following dates:

> (a) the date the Group Policy terminates;

> (b) the date ending the period for which you last contributed toward the cost of your insurance, if you discontinue your contributions; and

> (c) the date your employment as a member of the Eligible Group ends.

---

[66] Emphasis added.

. . .

Notwithstanding any provisions herein to the contrary, if any person is absent from active work as the result of retirement on pension, his employment may be deemed to continue for the purposes of insurance hereunder until terminated by the Policyholder.

Another section, "Life Insurance For You" states: "If your death occurs while you are insured under the Group Policy, [insurer[67]] will pay the amount of your group life insurance to your beneficiary."

Finally, three pages at the end of these SPDs set forth additional information about ERISA. One of the provisions states:  "The requirements for being covered under this plan, the provision concerning termination of coverage, a description of the plan benefits (including any limitations and exclusion which may result in reduction or loss of benefits) are shown on the preceding pages of this booklet."

SPD 9 also states: "The Group Policy is a contract between the Policyholder and Pilot Life which alone constitutes the agreement under which payments are made. It may be changed or terminated only by those parties."[68]  CT&T is designated as the Policyholder.

### 2. Discussion of SPDs 7, 8, and 9

Defendants argue that they are entitled to summary judgment with respect to these SPDs because the named Plaintiffs and selected class members cannot demonstrate an intent to provide vested benefits because (1) the aforementioned SPDs do not state that retirees' life insurance benefits are forever unalterable, and (2) the SPDs contain an express provision allowing for termination of the policy.  Plaintiffs contend that (1) because these SPDs do not contain reservation of rights provisions, Defendants do not have the power to make changes; (2) the SPDs contain

---

[67] In SPD 7, the insurer is EQUICOR. In SPD 8, the insurer is CIGNA. In SPD 9, the insurer is Pilot Life.

[68] SPDs 7 and 8 do not have this provision.

promises that indicate vested benefits; and (3) the language that the group policy can be terminated is ambiguous.

### (a) The SPDs do not contain affirmative, lifetime language

Plaintiffs contend that because these SPDs lack express ROR provisions, Defendants intended to provide vested lifetime benefits. The Tenth Circuit, however, requires that contractual vesting be stated in express language.[69] Other circuits also require affirmative contractual vesting language. "The absence of language in [a plan document] flatly *rejecting* the concept of vesting does not alter the retirees' failure to identify language that affirmatively operates to imply vesting."[70] Silence is not "tantamount to an affirmative contractual commitment."[71] Thus, the fact that these SPDs do not contain an express reservation of rights clause stating that the plans can be amended or terminated does not indicate unalterable lifetime benefits for the plan participants.

Plaintiffs also argue that the following language indicates an intent to provide vested, lifetime benefits:

> If you are an Employee who is retired on pension on or after June 1, 1981 . . . the amount of your Life Insurance during the first five years following the date of your retirement *will be* an amount equal to the amount of your Life Insurance on the day preceding the date of your retirement. On the fifth anniversary of the date of your retirement the amount of your Life Insurance *will automatically reduce* to the greater

---

[69] *Chiles*, 95 F.3d at 1513; *see also Welch,*, 382 F.3d at 1086.

[70] *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 135 (2d Cir. 1999).

[71] *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 938 (5th Cir. 1993). *See also Sullivan v. CUNA Mut. Ins. Soc'y*, 649 F.3d 553, 557 (7th Cir. 2011) ("To establish that rights have vested as a matter of contract, the plan participant must demonstrate that the employer tied its own hands. The absence from any given communication of language reserving a right to amend a plan is some distance from the presence of language negating that entitlement. Silence is just that—silence. Participants need more than silence to establish vested rights to lifetime benefits."); *Sengpiel v. B.F. Goodrich Co.*, 970 F. Supp. 1322, 1337 (N.D. Ohio 1997) ("[T]he mere absence of a reservation of rights clause does not establish that plan benefits are vested.").

of (a) one-half the amount of Life Insurance applicable to you prior to such fifth anniversary, and (b) $1,500.[72]

Plaintiffs, relying upon *Devlin v. Empire Blue Cross & Blue Shield*[73] assert that terms of this kind, "will be" and "will automatically reduce," indicate vesting. The Court disagrees. In *Devlin*, the Second Circuit looked at two provisions of an SPD and found that the language was " 'capable of reasonably being interpreted' as creating a promise to vest lifetime life insurance benefits."[74] The first provision in the SPD provided that "retired employees, after completion of twenty years of full-time permanent service and at least age 55 will be insured."[75] The second provision provided that life insurance benefits "will remain at the annual salary level for the remainder of their lives."[76] The language specifically states that individuals, who have completed twenty years of service and reached 55 years, *will be insured*. The Second Circuit determined that the language could "be construed as an offer that specifies performance as the means of acceptance—sometimes referred to as an offer for a unilateral contract—and promises lifetime insurance benefits upon performance."[77]

In Plaintiffs' case, there is no similar language offering lifetime benefits upon completion of performance. The language states that if an employee retires on pension on or after a certain date,

---

[72] Emphasis added.

[73] 274 F.3d 76 (2d Cir. 2001).

[74] *Id.* at 85. Notably, the Second Circuit's standard for proving vested welfare benefits appears more lenient than the Tenth Circuit's standard. In the Second Circuit, "[i]t is enough to point to written language *capable of reasonably being interpreted* as creating a promise on the part of the employer to vest the recipient's benefits." *Id.* at 83 (citation omitted). In contrast, in the Tenth Circuit, "[c]ontractual vesting of a welfare benefit is an extra-ERISA commitment that must be stated in clear and express language." *Chiles*, 95 F.3d at 1513.

[75] *Devlin*, 274 F.3d at 84.

[76] *Id.* at 85.

[77] *Id.* at 84.

"the amount of [his or her] life insurance . . . will be an amount equal to the amount of your Life Insurance on the day preceding [his or her] retirement."  The "will be" refers to the "amount" that the retiree may receive, rather than the term for which the retiree will receive it.

Furthermore, the SPD at issue in *Devlin* contained the additional statement that benefits "will remain at [the annual salary level] *for the remainder of their lives*."[78]  The Second Circuit determined that this "'lifetime' language . . . [was] sufficient to create a triable issue of fact as to whether [defendant] promised to vest retiree life insurance benefits at the stated level."[79]  In this case, the SPDs do not contain any similar durational language promising benefits for the remainder of the retiree's lifetime.  Accordingly, the Court finds that these SPDs do not contain express language promising lifetime benefits.  Nor do these SPDs contain ambiguous language regarding the company's intent to provide vested benefits.

### (b)  The SPDs contain termination provisions

The Court must read the SPDs as a whole, and there are several termination provisions in SPDs 7, 8, and 9.  All of these SPDs contain provisions which provide that "[y]our insurance under the Group Policy will end on . . . the date the Group Policy terminates."  SPD 9 contains an additional, express termination provision that states, "The Group Policy is a contract between the Policyholder and Pilot Life which alone constitutes the agreement under which payments are made. It may be changed or terminated only by those parties."  CT&T is designated as the Policyholder.

Plaintiffs nevertheless argue that Defendants cannot terminate or amend the plan because language in the SPDs specifically distinguishes the *plan* from the group *policy*.  At the end of the

---

[78] *Id.* at 85.

[79] *Id.*

group policy, it states that the plan is "the Group Life, Accidental Death and Dismemberment and Life Insurance on Dependents Plan," and the plan sponsor is CT&T. The SPD also provides that benefits under the plan are provided by the group policy.  Because of this distinction between the plan and the policy and the fact that the termination provisions reference the group policy, and not the plan, Plaintiffs contend that Defendants only have the right to terminate the policy—not the plan itself.   In the alternative, Plaintiffs contend that the language is ambiguous, which precludes Defendants from amending or terminating the benefits.

In *Gable v. Sweetheart Cup Co.*, the Fourth Circuit discussed a similar argument.[80]  In that case, the master policy was the relevant plan document, and it contained a provision stating, "This Policy may be amended or discontinued at any time . . . without the consent of or notice to any [plan participant.]"[81]  The plaintiffs argued that the modification clause reserved "only a right to change the particular insurance policy that the company purchased, not a right to change plan benefits in general."[82]  But, as the Fourth Circuit noted, "A company may establish an employee welfare benefit plan merely by purchasing a group policy for its employees."[83]  Thus, the Fourth Circuit found that the modification provision did not limit the company's right to amend the plan because the policy was the entirety of the welfare benefit plan.[84]

---

[80] 35 F.3d at 856.

[81] *Id.*

[82] *Id.*

[83] *Id.*  "An insurance policy may constitute the 'written instrument' of an ERISA plan." *Id.* (citing *Musto v. Am. Gen'l Corp.*, 861 F.2d 897, 900-01 (6th Cir. 1988)).

[84] *Id.*

In this case, the last pages of the SPDs provide that "all benefits of this plan are provided by [the group policy]."  They also state that "[t]he requirements for being covered under this plan . . . are shown on the preceding pages of this booklet."  Indeed, Plaintiffs do not identify any other written document establishing plan benefits, and they rely on the language in the SPD in an attempt to establish their vested benefits.  Thus, there does not appear to be a distinction between the policy and the plan.

None of these SPDs contain clear and express language providing for vested, lifetime benefits.  In addition, all three SPDs contain provisions indicating that benefits may terminate at some point.[85]  Accordingly, the Court grants Defendants' motion with respect to those Named Plaintiffs and Selected Class Members covered by SPDs 7 through 9.

### 3.  Discussion of Named Plaintiff Britt's Claim (SPD 7 and the 1984 CBA)

Named Plaintiff Britt retired in 1985. When he retired, CT&T and the Communications Workers of America ("CWA") were parties to a collective bargaining agreement effective November 30, 1984, through November 29, 1987 ("1984 CBA").  Britt contends that SPD 7 and the 1984 CBA are relevant to his claim of vested medical and life insurance benefits.  Thus, the Court must consider the 1984 CBA in conjunction with SPD 7 with respect to named Plaintiff Britt.

The 1984 CBA provides that "[t]he Company will maintain a medical insurance plan and pay 100% of the plan premium during the term of the agreement."  It also provides that "[o]ther insurance programs of the Company, including group life insurance . . . , shall remain in force during the term of the agreement."  Article 36, Section 1 of the 1984 CBA, "Duration of Agreement,"

---

[85] Admittedly, SPD 9's express termination clause is the strongest.  Nevertheless, language in the SPDs indicates that coverage may terminate at some point.

provides that "[t]his agreement becomes effective on November 30, 1984 and shall remain in full

force and effect until 12:00 midnight on November 29, 1987."  Section 2 states:

> This Agreement shall continue in full force and effect after November 29, 1987
> unless either party gives the other party sixty (60) days written notice to cancel,
> revise or modify part of the Agreement. In the event agreement is not reached within
> sixty (60) days after such notice of cancellation, the Agreement shall in all respects
> be voided and terminated. Extensions may be agreed to by written agreement
> between the parties.

Defendants do not specifically address how this CBA relates to named Plaintiff Britt's claim

of vested benefits.  Plaintiffs also do not address how this CBA specifically relates to Britt's claim,

but they do address some of the language contained in the CBA. Plaintiffs contend that because the

CBA expressly states that it will continue past the expiration date of November 29, 1987, unless the

union and the employer agree to a revision, the CBA providing for the retiree benefits does not

expire.  Because Defendants do not address whether the CBA remains in effect, they cannot

demonstrate the absence of a genuine issue of material fact.  Accordingly, the Court denies

Defendants' motion for summary judgment as to named Plaintiff Britt.

### c. The Third Group of SPDs (10 through 12 and 19)

These four SPDs are medical SPDs.  The language in these four SPDs is substantially

similar.  Language in these SPDs indicate that benefits will continue after retirement.  There is also

an express reservation of rights clause allowing Defendants to terminate or amend the plan for

reasons of business necessity and several termination provisions throughout the policy.

Named Plaintiff McLaurin contends that his medical benefits vested under the terms of SPD 10.[86]  Named Plaintiff Barnes contends that her medical benefits vested under SPDs 11 and 12.[87]  A total of 717 selected class members retired while SPDs 10 through 12 were in effect.  SPD 19 is substantially similar to SPDs 11 and 12.  An additional 55 class members retired while SPD 19 was in effect.

### 1. Language in these SPDs

SPDs 10 through 12 and 19 include the following provisions.  The section entitled "When You Retire" provides that "[a]ll benefits currently offered to active employees will continue after retirement by CT&T."  The "When Your Insurance Begins" section includes a sub-heading of "When You Retire."  Under this sub-section, it provides:

> All benefits currently offered to active employees will continue after retirement by CT&T.
>
> If you have not attained age 65, you will be insured for the same benefits currently offered to regular employees.
>
> If you have attained age 65, you will be insured for the same benefits currently offered to regular employees but subject to the application of the Non-Duplication of Benefits Provisions.

The "When Insurance Ends" section provides:

> Your insurance ends when any of the following events occurs:
>
> (1) you leave our employ
> (2) you are no longer eligible
> (3) the Group Policy ceases.
> . . .

---

[86] An additional 181 class members retired while SPD 10 was in effect.  Named Plaintiff Britt also relies upon SPD 10, but as noted above, Britt also falls under a collective bargaining agreement.

[87] An additional 725 class members retired while SPD 11 was in effect, and an additional 811 class members retired while SPD 12 was in effect.

If you are insured for your dependents under the Group Policy on the date of your death, and your spouse survives you, the Medical Care Insurance only on account of your Eligible Dependents may be continued, while the Group Policy remains in force and subject to all its provisions, until the widow's (or widower's) remarriage, provided the payment of any required contribution is made when due.

A "Cessation of Benefits (Group Health Insurance)" section provides:

No benefits (including any extended benefits) will be paid under the plan for any charges, fees or expenses incurred on or after the first of these dates to occur:

(1) the date the Group Policy ceases

(2) the date the coverage ends on the class of which a person is a member.

Finally, there are several pages at the end of these SPDs setting forth additional information about ERISA rights.  One of the provisions states: "The requirements for being covered by this plan, the provision concerning termination of coverage, a description of the plan benefits (including any limitations and exclusion which may result in reduction or loss of benefits) are shown on the preceding pages of this booklet."  Under "Future Plan Benefits," it provides that "[t]he Company expects to continue the Plan for the foreseeable future. However, the Company reserves the right to amend, discontinue or terminate the Plan, for reasons of business necessity or financial hardship."

SPD 10 also states, "The Group Policy is a contract between the Policyholder and Pilot Life. They are the only parties to the contract.  The contract alone is the agreement by which payments are made. It may be changed or terminated only by one of these parties."[88]  CT&T is designated as the Policyholder.

---

[88] SPDs 11, 12, and 19 do not contain this language.

### 2. Discussion of these SPDs

Defendants argue that they are entitled to summary judgment with respect to these SPDs because the named Plaintiffs and selected class members cannot demonstrate an intent to provide vested benefits because: (1) these SPDs do not state that retirees' life insurance benefits are forever unalterable, and (2) these SPDs contain provisions allowing for termination of the policy. Plaintiffs contend that unqualified promissory language indicates an intent to provide vested benefits, and the reservation of rights language only allows Defendants to terminate or amend the plan for business necessity or financial hardship which Defendants fail to demonstrate.

### (a) The SPDs do not contain affirmative, lifetime language

Plaintiffs assert that the following provisions in the SPDs are unqualified promises of vested, lifetime benefits for retirees: (1) "[a]ll benefits currently offered to active employees *will continue* after retirement," and (2) "you *will be insured* for the same benefits currently offered to regular employees." The Court will first address the "will continue" language.

The Tenth Circuit, and several other circuits, have addressed similar language and have determined that the language is not indicative of vested benefits. In *DeBoard*, the Tenth Circuit considered language in a plan providing that employees "would be allowed to continue participation in the Group Dental Plan at company expense" and that employees "would also be covered for $10,000 life insurance on [themselves] and $5,000 on [their spouse(s)] with Security Connecticut, with the premiums for these coverages also paid by the Company.[89] Despite the language that the employees' benefits "would be allowed to continue" and that the employees "would be covered" for

---

[89] 208 F.3d at 1234, 1242. As noted above, the Tenth Circuit determined that a letter sent to the retiring employees constituted the new benefit plan in which benefits for employees were established and looked to the language in that letter when determine whether, and what type of benefits, were vested.

a certain amount, the Tenth Circuit found that "[n]othing in this language suggests an intent on the part of defendants to create vested rights in dental and life insurance coverage."[90]

In *Sengpiel v. B.F. Goodrich Co.*, the Sixth Circuit considered a SPD which stated that "if you retire and are eligible for a pension you *shall continue* to have the same health coverage."[91] The Sixth Circuit determined that "such language neither expressly guarantees lifetime benefits nor creates an ambiguity as to whether such benefits are vested."[92] Other language in the plan provided that "a retiree's spouse *will continue* to receive benefits after the retiree dies 'until death or remarriage.' "[93] Although the Sixth Circuit found that this language was more persuasive, it still fell "far short of expressing a clear intent to render such benefits 'forever unalterable.' "[94] Similarly, in this case, the Court finds that the "will continue" language does not promise lifetime benefits nor establish an intent to provide vested, unalterable benefits. With respect to the language "you will be insured for the same benefits currently offered to  regular employees," Plaintiffs emphasize the "will be insured" language. This language, however, must be read in the context of the entire sentence, and it is simply explaining the type of benefits available to retirees after their retirement.[95] It does not state, nor imply, that benefits are forever unalterable once an individual retires.

---

[90] *Id.* at 1242.

[91] 156 F.3d at 668 (emphasis added).

[92] *Id.*

[93] *Id.* (emphasis added).

[94] *Id.*

[95] This language is unlike the plan language in *Devlin* which provided that individuals who had completed twenty years of service *will be insured*. 274 F.3d at 75. In that case, there was no qualifier to the "will be insured" language, and it simply provided that the individuals would be insured.

In sum, the language Plaintiffs identify as unqualified promises of lifetime benefits do no such thing. The language does not establish an intent to provide lifetime, unalterable benefits. Nor is the language ambiguous as to whether the company intended to provide vested benefits.

### (b)  The SPDs contain a ROR clause and termination provisions

Furthermore, SPDs 10 through 12 and 19 contain an express ROR provision. It provides that the company expects to continue the plan for the foreseeable future, but it reserves the right to amend, discontinue, or terminate the plan, for reasons of business necessity or financial hardship. Both parties rely upon the Tenth Circuit's opinion in *Chiles v. Ceridian Corporation* when interpreting the meaning of this ROR clause. Defendants contend that  the ROR clause is similar to the ROR clause in *Chiles*, and it gives Defendant almost unlimited authority to terminate or amend the plan. Plaintiffs contend that the ROR language contains a more rigorous standard for amending or terminating the plan than the one the Tenth Circuit considered in *Chiles*.

In *Chiles*, the ROR clause provided that the company intended to continue the plan indefinitely, but it reserved the right to change or discontinue it if it became necessary.[96]  In discussing this ROR clause, the Tenth Circuit found that "the termination clause retained almost unlimited discretion in [defendant] to change the plan. . . . The term 'if necessary,' found in the SPDs of all four Control Data plans, is not conditioned on any event or circumstance.  Thus its meaning cannot fairly imply, as plaintiffs suggest, that the plans can only be amended if necessary to their fiscal survival."[97]

---

[96] 95 F.3d at 1509, 1513.

[97] *Id.* at 1513.  *See also Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 792-93 (8th Cir. 2002) (finding that plaintiffs did not meet their burden of proving vesting language when a plan contained no specific vesting language and contained a reservation of rights clause allowing the company to discontinue benefits "if necessary").

In this case, the ROR clause does appear to impose a higher standard than the "if necessary" standard in *Chiles* because it is premised on "business necessity" or "financial hardship."  But the "business necessity" standard is only slightly more stringent because Defendants could amend the plan for business necessity.[98]  In any event, it is important to note that the issue before the Court is whether there is a question of fact as to whether the plan language indicates an intent to provide Plaintiffs with vested lifetime insurance benefits.  The fact that these SPDs contain an express ROR clause allowing the company to discontinue or terminate the plan, even premised on the basis of business necessity, indicates that Defendants did not intend to provide unalterable, vested benefits.[99]  In contrast, the ROR language indicates that the company contemplated amending or terminating the plan.

Furthermore, these SPDs contain several termination provisions throughout the SPDs. All of these SPDs include a provision stating that "your insurance ends when . . . . the group policy ceases."[100]  In addition, a section entitled "Cessation of Benefits" provides that "no benefits (including any extended benefits) will be paid under the plan . . . incurred on or after . . . the date the Group Policy ceases."  Finally,  SPD 10 contains an express termination provision stating that CT&T can change or terminate the policy.[101]  For the reasons set forth above in Section I(C)(4)(b)(2)(b) of this Order, the Court finds that these termination provisions indicate that

---

[98] The Court disagrees with Plaintiffs' assertion that "business necessity" has a financial aspect because of its close proximity to the term "financial hardship."  The use of the word "or" indicates that the company reserved the right to amend or terminate benefits on the basis of either business necessity *or* financial hardship.

[99] *See Hughes*, 281 F.3d at 792-93 ("It is plain and unambiguous that the word 'intends' does not indicate finality. To hold otherwise would render the words 'reserves the right to change or discontinue it if necessary' meaningless.").

[100] These termination provisions are similar to the termination provisions in SPDs 7 through 9.

[101] SPD 10's provision is similar to SPD 9's termination provision.

Plaintiffs' benefits were not vested and unalterable. When considering the SPDs as a whole, the Court cannot find questions of fact as to whether Defendants intended to provide vested benefits. Nor can the Court find that these SPDs are ambiguous. Accordingly, the Court grants Defendants' motion for summary judgment with respect to those Named Plaintiffs and Selected Class Members covered by SPDs 10 through 12 and 19.

### d. The Fourth Group of SPDs (13 through 15 and SPDs 20 through 23)

The fourth group of SPDs relate to life insurance benefits. Language in these seven SPDs is substantially similar. Named Plaintiffs Betty and Kenneth Carpenter contend that their life insurance benefits vested under SPD 13.[102] Named Plaintiff Somdahl alleges that his life insurance benefits vested under the terms of SPD 14.[103] A total of 360 selected class members retired while SPDs 13 and 14 were in effect. SPDs 20 through 23 are substantially similar to SPDs 13 and 14. An additional 306 class members retired while SPDs 20 through 23 were in effect. Named Plaintiff King contends that his life insurance benefits vested under SPD 15.

### 1. Language in these SPDs

All of these SPDs contain charts showing the amount of contributory life insurance depending on the employee's annual compensation. In the "Notes" section of all of these SPDs, except SPD 15, it provides:

> If you have at least five years of service with United Telephone System on the date you retire, your Basic Contributory Life Benefits *will be reduced* by 50 percent. Such insurance will not be more than $13,000.[104]

---

[102] An additional 314 class members retired while SPD 13 was in effect.

[103] An additional 46 class members retired while SPD 14 was in effect.

[104] Emphasis added.

. . . .

If you retire after age 65, your Life Benefits will not be less than the Life Benefits you would be entitled to if you retired prior to age 65.

SPD 15 includes the following provision:

Your basic Contributory Life Benefits *will be reduced* by 50% when you retire. Such insurance will not be more than $13,000. If you have 10 or more years of service, this $13,000 maximum will be increased to 50% of the amount of Basic Contributory Life up to a maximum of $25,000, whichever is less, for anyone retiring on or after 5/1/84. Any excess amount over the basic $13,000 will be payable only to a surviving spouse. If there is no surviving spouse or if the employee so designates, it will be payable to a minor or dependent child or children as defined in our group health and medical insurance plan. This excess amount over $13,000 will be paid as a survivor's insurance and will be paid in equal monthly installments.

All of these SPDs include the following language:

When Insurance Ends

Your insurance ends when any of the following events occurs:
1. You leave our employ.
2. You are no longer eligible.
3. The group policy ceases.

On the last pages of these SPDs, entitled the Certificate of Insurance, additional information about ERISA rights are set forth.  The last provision on "Future Plan Benefits" provides that "[t]he Company expect to continue the plan for the foreseeable future.  However, the company reserves the right to amend, discontinue or terminate the plan, for reasons of business necessity or financial hardship."

### *2. Discussion of these SPDs*

Defendants and Plaintiffs assert the same argument that they asserted with respect to SPDs 10 through 12.  That is, Defendants argue that they are entitled to summary judgment because the named Plaintiffs and selected class members cannot demonstrate an intent to provide vested benefits because: (1) these SPDs do not state that retirees' life insurance benefits are forever unalterable, and (2) these SPDs contain express provisions allowing for termination of the policy.  Plaintiffs again contend that unqualified promissory language indicates an intent to provide vested benefits, and the reservation of rights language only allows Defendants to terminate or amend the plan for business necessity or financial hardship which Defendants fail to demonstrate.

### *(a)  The SPDs do not contain affirmative, lifetime language*

Plaintiffs identify the following language in SPDs 13, 14, and 20 through 23, as unqualified, promissory language of lifetime benefits: "If you have at least five years of service with United Telephone System on the date you retire, your Basic Contributory Life Benefits *will be reduced* by 50 percent."  With respect to SPD 15, Plaintiff Somdahl contends that the following language is indicative of lifetime benefits:

> Your basic Contributory Life Benefits *will be reduced* by 50% when you retire. . . .  Any excess amount over the basic $13,000 *will be payable* only to a surviving spouse. If there is no surviving spouse or if the employee so designates, it *will be payable* to a minor or dependent child or children as defined in our group health and medical insurance plan. This excess amount over $13,000 will be paid as a survivor's insurance and *will be paid* in equal monthly installments.[105]

Plaintiffs contend that the "will be reduced" language demonstrates Defendants' intent to provide vested benefits.  This language does not promise lifetime benefits nor state the duration of

---

[105] Emphasis added.

life insurance benefits.  Instead, the language merely sets forth the amount of life insurance benefits and how it will be reduced.  Furthermore, there is no other language in these SPDs indicating the duration of these benefits.[106]  Thus, the Court finds no affirmative language indicating an intent to provide vested, unalterable benefits.

### (b) The SPDs contain a ROR clause and termination provisions

In addition, these SPDs contain (1) a ROR provision identical to the ROR provision contained in SPDs 10 through 12; and (2) a section entitled "When Your Insurance Ends" similar to the "When Your Insurance Ends" section in SPDs 10 through 12.  With respect to the ROR provision and termination provisions in SPDs 13 through 15 and 20 through 23, the Court adopts the reasoning set forth above in Section I(C)(4)(b)(2)(b) of this Order.

When considering these SPDs in their entirety, there is no express language  indicating an intent to provide vested, lifetime benefits nor language indicating an ambiguity as to whether Defendants intended to provide lifetime benefits. Thus, there are no questions of fact, and the Court grants Defendants' motion for summary judgment with respect to those named Plaintiffs and selected class members covered by SPDs 13 through 15 and SPDs 20 through 23.

### e. Named Plaintiff Clark's Claim (SPDs 16 and 17 and the 1974 CBA)

The final two SPDs, 16 and 17, are only applicable to named Plaintiff Clark.[107]

---

[106] The Court also notes that this language is similar to the language contained in SPDs 7 through 9 which provided that "the amount of your life insurance . . . *will be* an amount equal to the amount of your Life Insurance on the day preceding your retirement."  The reasons set forth above in section I(C)(4)(b)(2)(a) are applicable here as well.

[107] No other class members rely on these SPDs. Furthermore, Defendants do not identify any other SPDs containing similar language to SPDs 16 and 17.

### *1. Language in these SPDs and language in the CBA*

SPD 16 relates to medical benefits and provides that "[i]nsurance coverage for you and your dependents can be continued after retirement." SPD 17 addresses life insurance benefits. It provides under the "Eligibility" section that "[r]egular life insurance, but not Accidental Death and Dismemberment, is continued for employees after retirement." It also provides under the section of "Limitation of Benefits:"

> Regular life insurance, but not Accidental Death and Dismembership, is continued for employees after retirement if they have been insured the entire time they were eligible after age forty-five. On the fifth anniversary of retirement, the amount of the insurance is reduced by fifty percent (50%) and remains at that figure for lifetime.

Both SPD 16 and 17 contain the following provisions:

> Termination of Benefits
>
> Insurance coverage will automatically terminate if your active full time employment in the classes eligible for insurance terminates, or if the provisions of the group policy under which you are covered terminate.
>
> Collective Bargaining Agreement
>
> This plan, as applicable to union represented employees, is maintained pursuant to a collective bargaining agreement. Benefits under the plan for employees covered under the bargaining agreement will depend on the terms of the agreement.

When Clark retired in 1976, CT&T and the CWA were parties to a CBA effective June 29, 1974. Clark testified that as an hourly employee, he was covered by this CBA. This 1974 CBA provides:

> The insurance programs of the Company, including group life insurance, dependent life insurance, basic hospitalization insurance and extraordinary medical expense plan, shall remain in force during the term of the Agreement. . . .

> The Company reserves the right to charge individual employees with any increases in premium costs beyond those in effect for all insurance programs on the date of this Agreement.

Article 36, Section 1 of the 1974 CBA, "Duration of Agreement," provides that "[t]his agreement becomes effective at 12:00 noon on June 29, 1974 and shall remain in full force and effect until 12:00 noon on June 29, 1977 . . . ." Section 3 provides:

> This Agreement shall continue in full force and effect after June 29, 1977 unless either party gives the other party sixty (60) days written notice to cancel, revise or modify part of the Agreement. In the event agreement is not reached within sixty (60) days after such notice of cancellation, the Agreement shall in all respects be voided and terminated. Extensions may be agreed to by written agreement between the parties.

### 2. Discussion

Defendants provide no evidence that this CBA expired and do not address whether the CBA remains in effect. Thus, Defendants cannot demonstrate the absence of a genuine issue of material fact. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to named Plaintiff Clark.

### f. Conclusion

In sum, the Court grants in part Defendants' Motion for Summary Judgment on Named Plaintiffs' Contractual Vesting Claims. The Court grants it with respect to all named Plaintiffs except Plaintiffs Britt and Clark. With respect to these two named Plaintiffs, the Court denies the motion. The Court grants Defendants' Motion for Summary Judgment on Selected Class Members Contractual Vesting Claims in full.

**D. Defendants' Motion to Decertify Class Action (Doc. 285)**

Defendants also bring a Motion to Decertify Class Action.  In this motion, they argue that individual questions predominate over common questions of fact.  Since Defendants filed the motion, multiple events have occurred.  First, as noted above, Judge O'Hara entered a sanction order precluding class members from taking a position in the litigation inconsistent with Defendants' document-to-class-member mapping.  Thus, the remaining class members cannot identify additional CBAs or documents relevant to their claim of contractual vesting and are bound to the documents Defendants identified.  Accordingly, there may not be the voluminous amount of documents for the Court to consider.

Next, only two named Plaintiffs remain with respect to the contractual vesting claims because the Court granted in part Defendants' Motion for Summary Judgment.[108]  Both of these Plaintiffs rely on a different CBA and different SPDs.  Because the remaining class members cannot rely on the same CBAs as Plaintiff Britt and Plaintiff Clark, these class members do not appear similar to the two remaining named Plaintiffs.

The Court notes that Defendants only brought summary judgment on some of the SPDs and the class members covered by those SPDs. The Court is unclear as to how many SPDs and class members remain in the case. Because of these factors, the Court cannot determine whether other class members are similarly situated or whether the remaining SPDs contain similar language applicable to numerous class members. Accordingly, the Court denies Defendants' Motion to

---

[108] The Court notes that Defendants argue in their Motion to Decertify Class Action that individual issues predominate over common questions while simultaneously asserting in their Motions for Summary Judgment that the Court can determine the question of contractual vesting for numerous class members.

-47-

Decertify Class Action without prejudice to refiling the motion based on the current factual circumstances of the case.

## II. Breach of Fiduciary Duty Claim under ERISA

Plaintiffs' second claim is a breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(3). This statute provides that "a civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter or the terms of the plan."   Plaintiffs assert that Defendants breached their fiduciary duty by misrepresenting the terms of the plans by affirmatively telling Plaintiffs that their medical and life insurance benefits were lifetime benefits. Plaintiffs also contend that Defendants failed to inform them that their benefits could change.

### A.  Factual Background

The seventeen named Plaintiffs bring this claim.[109]   Defendants for this claim include Embarq, the Employee Benefits Committee of Embarq, Sprint Nextel, Embarq Mid-Atlantic, CT&T, and Randall Parker.  With respect to the evidence that the parties presented,[110] the Court will only give a broad view. Most of the seventeen named Plaintiffs worked for the company for approximately thirty-five years. The seventeen Plaintiffs retired from Defendant between 1976

---

[109] When Plaintiffs sought certification of the ERISA class for claims one and three (contractual vesting claims), they also sought the Court's certification of the first three elements of their breach of fiduciary duty claim. The Court denied their request because it appeared that individualized inquiries predominated common questions of fact. *See* Doc. 199 in Case No. 07-2602. In late 2011, approximately 920 of the ERISA class members in this case filed *Abbott v. Sprint Nextel Corporation*, Case No. 11-2572, in the District of Kansas. *See* Case No. 11-CV-2572-EFM-GLR, Doc. 1. They assert a breach of fiduciary duty claim. Case No. 11-2572 is stayed pending the resolution of the summary judgment motions in this case.

[110] Both parties object to the majority of the other party's "uncontroverted" facts.

through 2003.[111] Fifteen of these seventeen Plaintiffs effectuated their retirement prior to December 28, 2007. All of these Plaintiffs received medical benefits and were entitled to life insurance benefits until Embarq announced a change to those benefits in 2007.[112]

Benefits Supervisor Gayle Phillips worked for the company for thirty years in the benefits arena. Phillips counseled thousands of retirees and managers, face to face and in group meetings, and did not tell them that the company was reserving its right to terminate the benefits. Phillips had her staff create checklists to be distributed to retirement-eligible employees, and she expected employees to rely upon these checklists.

An example of a portion of a checklist is as follows. It states:

Life insurance (2x) will be continued at no cost to the retiree. The provisions for accidental death and dismemberment are excluded for retired personnel. On the fifth anniversary of your retirement, insurance will be reduced by 50% and will remain at this figure for the remainder of the retiree's lifetime.

In addition, the checklist has language regarding medical insurance. One version of the checklist states: "If the retiree is participating in the group medical care and dental insurance plans, insurance may be continued after retirement provided the monthly premium (if applicable) is paid. . . . The premium (if applicable) will automatically be deducted from the retiree's pension check." Another version of the checklist states: "Medical care insurance will be continued at no cost for the retiree and their dependent(s)." Seven of the named Plaintiffs contend that they were given a version of these checklists. Phillips also spoke with several of the named Plaintiffs regarding their retirement benefits.

---

[111] Named Plaintiff Clark retired in 1976, and named Plaintiff Barnes retired in 2003.

[112] Clark received these benefits without interruption from 1976 through 2007.

In late 2001, E.J. Holland, Jr., CT&T's Vice-President in charge of Compensation, Benefits, and Labor Relations, sent a letter to several of the named Plaintiffs describing a new benefit program, Sprint Healthcare Annual Retiree Election ("SHARE"), to be implemented in 2002.  This letter briefly summarized how benefits would work if an employee retired in 2001 or if an employee retired in 2002 or later. One individual testified that human resources representatives told employees concerned about the new SHARE program that they had to retire by the end of 2001 to retain their grandfathered life insurance and FlexCare medical insurance for the remainder of their lives. Several employees were forced to waive vacation time to keep this lifetime coverage.[113]

In November 2005, Sprint announced that the prescription drug benefits for participants and beneficiaries who were eligible for Medicare Part D coverage would be modified such that each participant and beneficiary would receive $41.67 a month, or $500 a year, effective January 1, 2006.

In July 2007, prior to Embarq's announcement of the medical care and life insurance benefit changes, the human resources staff created a question and answer memorandum to assist representatives in answering questions about the changes.  One of the questions stated: "I have a letter that states I will receive medical and life insurance benefits for life."  The answer to be provided: "Please send us a copy of that letter to the following address: . . . We will research our records and you will be provided with a written response within 60 days."

On July 26, 2007, Embarq announced that (1) company-sponsored medical coverage and the prescription drug subsidy provided to Medicare-eligible retirees and Medicare-eligible dependents of retirees would be eliminated effective January 1, 2008;  (2) basic life insurance coverage would be eliminated for retirees who were participants in the CT&T VEBA effective September 1, 2007;

---

[113] Named Plaintiff Bullock testified that she had to waive twenty-five days of vacation in order to keep the grandfathered life insurance benefits.

and (3) basic life insurance coverage would be capped at $10,000 for all other retirees effective January 1, 2008.

## B. Defendants' Motion for Summary Judgment on Breach of Fiduciary Duty Claim (Doc. 338)

Plaintiffs contend that Defendants breached their fiduciary duty to them by making misrepresentations in SPDs, other written documents, and in oral statements that they were entitled to lifetime medical and life insurance benefits when, in fact, they were not. Defendants argue that the Court should grant summary judgment because (1) the SPDs contain no misrepresentations or omissions, (2) the other written documents do not contain actionable misrepresentations or omissions, (3) the oral statements fail as a matter of law and cannot override the written language in the SPDs, (4) some of the oral statements were not made on behalf of the fiduciary, (5) Plaintiffs' reliance on the alleged misrepresentations or omissions was not reasonable, and (6) Plaintiffs' claims are barred by the statute of repose. Plaintiffs disagree with all of these contentions.

### 1. ERISA Fiduciary Law

A fiduciary has a duty to act "solely in the interest of the participants and beneficiaries."[114] To date, the Tenth Circuit has not set forth a definitive test for a breach of fiduciary duty claim based on a misrepresentation under ERISA.[115] In a previous Order in this case, the Court relied on a test articulated by the Third Circuit and set forth these four elements: "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant: (3) the

---

[114]*See Horn v. Cendant Operations, Inc.*, 69 F. App'x 421, 427 (10th Cir. 2003) (citing 29 U.S.C. § 1104(a)(1)(A)).

[115] *See Kerber*, 647 F.3d at 968 (noting that the Circuit had not adopted a test and determining that it need not determine which version of the test to adopt in the case before it).

materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation."[116]

## 2. Discussion

The Court will first address Defendants' statute of repose argument because it is dispositive of most of Plaintiffs' breach of fiduciary duty claims.[117]  There is only one limitations period in ERISA, and it is for breach of fiduciary duty claims. ERISA section 413 provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.[118]

"As a statute of repose, § 413 serves as an absolute barrier to an untimely suit."[119]

---

[116] Doc. 199, p. 5. The Court relied on *Romero v. Allstate Corp.*, 404 F.3d 212, 226 (3d Cir. 2005). The Court notes that the parties now dispute whether detrimental reliance is an element of a breach of fiduciary duty claim. The Court will discuss this contention in more detail below.

[117] The statute of repose argument is not applicable to named Plaintiffs Barnes and Dillon. Plaintiff Barnes retired in 2003, and she contends that misrepresentations were made to her immediately prior to her retirement.
Although Defendants contend that the statute of repose argument is applicable to named Plaintiff Dillon, the Court cannot so conclude. It is unclear as to when Dillon retired as both parties assert different dates. Defendants assert both that Dillon retired in December 2002 and that he retired prior to December 28, 2001. Plaintiffs assert that Dillon was told that he would receive lifetime benefits if he retired prior to 2002 but that he effectuated his retirement in 2003. Thus, there is a question of fact as to Plaintiff Dillon's retirement date and whether the alleged misrepresentations he received in 2002 and 2003 were prior to or after his retirement date.

[118] 29 U.S.C. § 1113.

[119] *Radford v. Gen'l Dynamics Corp.*, 151 F.3d 396, 400 (5th Cir. 1998). *See also Ranke v. Sanofi-Synthelabo*, 436 F.3d 197, 205 (3d Cir. 2006) (recognizing that § 413(1)'s general six-year limit is a statute of repose).

All Plaintiffs contend that Defendants breached their fiduciary duty by making misrepresentations that they were entitled to lifetime benefits. Plaintiffs contend that had they known their benefits could be terminated, they would have made different retirement and post-retirement decisions. Defendants argue that to the extent there was a breach of fiduciary duty, it was complete no later than the date Plaintiffs either stopped working or made the decision to retire. Because most of the Plaintiffs made the decision to retire at least six years before commencing this suit, Defendants assert that Plaintiffs' breach of fiduciary duty claim is barred by the six-year statute of repose.

Plaintiffs disagree and first argue that their claims are tolled by the statute's "fraud or concealment" provision because their breach of fiduciary duty claim is based on misrepresentations. Thus, Plaintiffs contend that the statute does not begin to run until Plaintiffs discovers the wrong.[120] "With rare exceptions, the courts of appeals have interpreted the final clause of § 413's as incorporating the federal doctrine of fraudulent concealment: The statute of limitations is tolled until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment."[121]

Although the Tenth Circuit has not addressed this specific issue, other circuits have done so. For the fraud or concealment provision to be applicable, the Third Circuit stated

> [W]hen a lawsuit has been delayed because the defendant itself has taken steps to hide its breach of fiduciary duty, the limitations period will run six years after the date of the claim's discovery. The relevant question is therefore not whether the

---

[120] Plaintiffs do not identify when they "discovered" the underlying fraud.

[121] *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996) (collecting cases and noting five other circuits' applications of tolling in the case of fraudulent concealment).

complaint "sounds in concealment," but rather whether there is evidence that the defendant took affirmative steps to hide its breach of fiduciary duty.[122]

In a later case, the Third Circuit noted that

> [I]f all that a plaintiff can show is that a counselor represented to him that he had guaranteed lifetime health benefits or failed to give him accurate advice knowing that he believed he had such benefits, the fraud or concealment clause is inapplicable. In such cases, [defendant] cannot be said to have taken affirmative steps, either as part of the original breach of duty or thereafter, to cover up its breach.[123]

In this case, the fraud or concealment provision is inapplicable because there is no evidence that Defendants actively concealed their alleged breach of fiduciary duty. Indeed, Plaintiffs do not assert this proposition. Instead, they contend that Defendants' underlying misrepresentations were the "fraudulent" acts. Because the Court concludes that there is no evidence of affirmative steps of fraud or concealment, the six year limitation period for the discovery of fraud or concealment is inapplicable.[124]

Because tolling by fraudulent concealment is inapplicable in this case, the relevant limitation period is contained in § 413(1), which provides the limitation period of "six years after (A) the date of the last action which constituted a part of the breach or violation."[125] The parties disagree as to "the date of the last action which constituted a part of the breach." They disagree, in part, because they dispute whether detrimental reliance or harm is the final element of Plaintiffs' breach of

---

[122] *Id.* (citations omitted).

[123] *In re Unisys Corp. Retiree Medical Benefits "ERISA" Litigation (Unisys III)*, 242 F.3d 497, 503 (3d Cir. 2001).

[124] Even if the "fraud or concealment" provision of the statute cannot be read as a fraudulent concealment "tolling" provision, the provision remains inapplicable. The Court cannot categorize Plaintiffs' breach of fiduciary duty allegations as a fraud or concealment claim because it was not alleged as such. Fraud must be plead with particularity. Fed. R. Civ. P. 9(b). And Plaintiffs failed to provide fraud with particularity in the Amended Complaint or in the Pretrial Order.

[125] Neither party asserts that § 413(2) is applicable here.

fiduciary duty claim.  Defendants contend that the last action occurred when Plaintiffs detrimentally relied upon the alleged misrepresentations, i.e, when Plaintiffs made the decision to retire.  Plaintiffs, however, contend that the United States Supreme Court's decision in *CIGNA Corp. v. Amara*[126] eliminated the element of detrimental reliance in breach of fiduciary duty claims.  Plaintiffs therefore argue that the last action occurred when Defendants reduced or terminated the benefits because that is when the harm occurred.[127]  Plaintiffs, however, do not claim that Defendants breached their fiduciary duty by changing or terminating their benefits—they contend that Defendants breached their fiduciary duty by misrepresenting the longevity of those benefits.  And although they contend that they were harmed when the benefits were taken away, the misrepresentation of lifetime benefits did not cause the resulting harm.[128]  As the Third Circuit noted in *Unisys III*, "the alleged breach of fiduciary duty here concerned the counsel allegedly given or not given, and there is no causal nexus between that counsel and the denial of [benefits.]"[129]

---

[126] 131 S.Ct. 1866 (2011).

[127] Plaintiffs use the date that Defendants terminated the prescription drug plan which was effective January 1, 2006.

[128] The Court notes that in the Pretrial Order, Plaintiffs specifically state that an element of their breach of fiduciary duty claim requires that "[h]e or she was harmed and suffered injury *as a result* of the material misrepresentations." Doc. 295, p. 31 (emphasis added).

[129] *Unisys III*, 242 F.3d at 506.

Furthermore, the termination of the plan is a non-fiduciary act.[130]  Thus, it cannot be considered a part of the breach of fiduciary duty,[131] and the date that benefits were terminated cannot be considered the "last action which constituted a breach" under § 413(1).

In addition, even if Plaintiffs are correct that harm is the final element of their breach of fiduciary duty claim, some circuits have determined that it is unnecessary for actual harm to occur before the statute of limitations can begin to run.  In *Ziegler v. Connecticut General Life Insurance Co.*, the Court of Appeals for the Ninth Circuit stated that when considering ERISA's statute of limitations, it was necessary to isolate the underlying violation that the plaintiff claimed to be the breach of fiduciary duty.[132]  In that case, the court found that the breach occurred in the making of the contract.[133]  Although the actual harm was only hypothetical and would not occur until a distribution occurred under the contract (several years later), the court found that the breach occurred at the time the parties made the contract.[134]  Thus, the court found that the plaintiff "need never have suffered an actual harm for its ERISA cause of action to have accrued."[135]  Furthermore, in *Larson v. Northrop Corp.*, the Court of Appeals for the District of Columbia found that a plaintiff

---

[130] *See Curtiss-Wright*, 514 U.S. at 78 (stating that under ERISA, employers and other plan sponsors are generally free to modify or terminate welfare plans at any time and do not act in a fiduciary capacity in making those amendments or terminations). *See also Amara*, 131 S. Ct. at 1877 (noting that the plan's sponsor (the employer) and the plan's administrator (a trustee-like fiduciary) perform different roles and although the same entity may fulfill both roles, "ERISA carefully distinguishes these roles."); *Unisys III*, 242 F.3d at 506 (finding that the employer had the right to terminate coverage, "and it exercised that right in a non-fiduciary capacity.").

[131] *See Unisys III*, 242 F.3d at 506 (finding that denial of coverage was not an element of the plaintiffs' claim).

[132] 916 F.2d 548, 550-51 (9th Cir. 1990). The Court notes that a different subsection of the statute of limitations, § 413(2), was at issue in *Ziegler*.

[133] *Id.* at 551.

[134] *Id.*

[135] *Id.*

did not have to suffer actual harm before the statute of limitations begins to run.[136]  The court found that the last action constituting a part of the defendant's breach of fiduciary duties occurred when the defendant purchased an allegedly deficient contract–approximately four years before the plaintiff was "harmed" and more than six years before the plaintiff brought suit.[137]  Thus, the court found that the statute of limitations contained in § 413(1) barred the plaintiff's suit.[138]

In this case, the Court finds that the relevant inquiry under § 413 as to the "last action which constituted a part of the breach or violation" is the date the alleged misrepresentations were made.  As noted by the Third Circuit, "ERISA's general six-year statute of limitations is triggered by a fiduciary's action, not a beneficiary's discovery of the breach."[139]  This suit was filed on December 28, 2007.  Thus, the Court must determine whether any of Defendants' alleged misrepresentations occurred between December 28, 2001, and December 28, 2007.

As noted above, Defendants contend that the relevant date for the "date of the last action which constituted a breach" is the date of detrimental reliance—the date that Plaintiffs decided to retire.  And the Court is cognizant that the Third Circuit, in *Unisys III*, found the retirement date to be the relevant date because that was the last date the plaintiffs detrimentally relied upon the defendant's alleged misrepresentations.[140]  Although the Court finds the appropriate date to be the

---

[136] 21 F.3d 1164, 1170 (D.C. Cir. 1994). This case addressed § 413(1).

[137] *Id.* at 1171.

[138] *Id.*

[139] *Ranke*, 436 F.3d at 205.  "Starting the running of the statute of limitations on the date of discovery of the breach, absent 'fraud or concealment,' would prevent the fiduciary from being able to recognize a firm cutoff date for future breach of duty claims, which is inconsistent with a statute of repose." *Id.*

[140] *Unisys III*, 242 F.3d at 506. In *Unisys III*, the parties also agreed that the date of detrimental reliance (retirement date) and the date of the last misrepresentation were the same date.   *Id.* at 506, n. 8.

date of Defendants' misrepresentations, Plaintiffs' retirement dates are still relevant. Fifteen Plaintiffs made the decision to retire prior to December 28, 2001.    Thus, the alleged misrepresentations which caused Plaintiffs to retire necessarily had to occur prior to this date.[141] Accordingly, fifteen of the seventeen named Plaintiffs' breach of fiduciary duty claims are barred by the six year statute of limitations.

These Plaintiffs, however, argue that their action remains timely because although they retired prior to December 28, 2001, they each identify an action (or forbearance to act) that he or she took during the six years preceding suit.[142]  With respect to Plaintiffs' alleged post-retirement acts of reliance, subsequent acts of reliance do not "reset the clock" if the plaintiff's claim has already accrued.[143]  Thus, Plaintiffs' later acts of reliance would not allow Plaintiffs' claim to fall within the statute of limitations either.

Accordingly, the Court grants in part Defendants' Motion for Summary Judgment on Plaintiffs' Breach of Fiduciary Duty Claim with respect to fifteen of the seventeen named Plaintiffs, and denies it with respect to Plaintiff Barnes and Dillon.

### III. Age Discrimination Claims

Plaintiffs originally set forth disparate treatment and disparate impact claims under the ADEA; however, Plaintiffs only proceed on their disparate impact theory.  Plaintiffs claim that Defendants discriminated against Plaintiffs "on the basis of age when it reduced or terminated retiree

---

[141] Although Plaintiffs dispute that detrimental reliance is an element of their breach of fiduciary duty claim, they alternatively argue that they present sufficient evidence of detrimental reliance because they made the decision to retire, which was to their detriment, based upon Defendants' misrepresentations.

[142] For example, one Plaintiff contends that he made house remodeling decisions based on the alleged misrepresentation of lifetime benefits.

[143] *See Ranke*, 436 F.3d at 203.

life insurance benefits . . . because that action had a discriminatory adverse impact based on age."[144] Specifically, Plaintiffs contend that the reduction or elimination of retiree life insurance benefits disparately impacted older retirees more harshly than younger retirees.[145]  Plaintiffs' state law age discrimination claims are identical to Plaintiffs' ADEA claim.

## A. The Parties

## 1. Plaintiffs and the Collective Class

The ADEA claims are brought by seventeen named Plaintiffs, as well as by approximately 750 retirees referred to in Plaintiffs' Third Amended Complaint as the "Individual Age Discrimination Plaintiffs."   More than 8,000 individuals have opted in and agreed to have their ADEA claims tried in this collective action.  The ADEA class is defined as: "All persons, including all plan participants and all eligible spouse and dependent plan beneficiaries, whose rights to retiree life insurance benefits have been adversely affected by the terminations, reductions and changes in retiree life insurance benefits which were announced by Defendant Embarq Corporation on July 26, 2007."[146]  In addition, three sub-classes under Fed. R. Civ. P. 23(b)(1)(b) and (b)(2) were certified with respect to Plaintiff's Fifth Claim (violation of Ohio's age discrimination statute), Sixth Claim (violation of Oregon's age discrimination statute), and Seventh Claim (violation of Tennessee's age discrimination statute) (collectively, the "state age discrimination claims").  If a Plaintiff's last place of employment was in one of these three states, he or she is a member of one of the three sub-

---

[144] *See* Pretrial Order, Doc. 295, p. 28.

[145] Plaintiffs also claim that the elimination and reduction of medical and prescription drug benefits was discriminatory under the ADEA. The Court, however, previously dismissed this portion of the claim because the ADEA claim failed as a matter of law "because federal regulation expressly permits reduction in such benefits for Medicare-eligible retirees." *See* Doc. 45, p. 22.

[146] Doc. 210-1.

classes. In addition, there is the VEBA sub-class which includes individuals who were participants in CT&T's Voluntary Employee Benefits Association ("VEBA") plan.

**2. Defendants**

The defendants with respect to Plaintiffs' ADEA claim are Embarq Corporation, CT&T, and Embarq Mid-Atlantic Management Service Company (collectively, "Embarq"). The sole defendant with respect to Plaintiffs' state age discrimination claims is Embarq Corporation.

**B.  Factual Background**[147]

Employees who retired from Defendants prior to 2004 received company-subsidized basic life insurance benefits. The amount of those benefits varied depending upon the time, and the company from which, an employee retired. The benefits ranged from a maximum of two times a retiree's last annual pay rate to less than $5,000, with the most frequent amounts being between $10,000 and $25,000.

CT&T non-bargaining unit employees and bargaining unit employees represented by certain local unions participated in the CT&T VEBA plan. This plan provided for a retirement death benefit equal to one times the retiree's last annual pay. Retiree participants in the VEBA plan also received basic life insurance coverage in addition to the VEBA retirement death benefit.

Embarq spun off from Sprint effective May 17, 2006. Randall Parker, Director of Benefits for Embarq,[148] averred Embarq needed to manage its cost structure to remain competitive and

---

[147] In accordance with summary judgment procedures, the Court sets forth the uncontroverted facts given to the Court in Defendants' Motion for Summary Judgment on Plaintiffs' Age Discrimination Claims and Plaintiffs' response to that motion.

[148] In Mr. Parker's affidavit, he averred that he was responsible for the design, development, pricing, communications and overall administration of the companies' benefit plans, including the companies' health care and other welfare benefit plans.

maintain profitability, in part because revenues from its core business, traditional "landline" telephone service, were steadily shrinking.  Parker also averred that Embarq wanted to reduce costs in ways that would not jeopardize customer service or the company's revenues and believed a way to do this was to reduce retiree life insurance benefits.  Embarq's post-retirement life insurance program was costly to maintain.  As of June 2007, approximately 76% of retiree life insurance coverage was underwritten through a fully-insured contract, and Embarq funded the remaining 24% liability through a self-insured arrangement.  Embarq's share of retiree life insurance costs was $9 million in cash annually, and resulted in an $11.3 million annual expense charge to its income statement and an accrued balance sheet liability of $169.5 million.

At a meeting on June 27, 2007, financial projections provided to Embarq's Employee Benefits Committee ("EBC") showed that: (a) eliminating CT&T VEBA retirees' basic life insurance benefits would result in annual cash savings of $1.6 million, annual expense reductions of $4 million, and a reduction in accrued balance sheet liabilities of $31 million; (b) capping non-VEBA retiree life insurance benefits at $10,000 would result in annual cash savings of $2.5 million, annual expense reductions of $5.4 million, and a reduction in accrued balance sheet liabilities of $41.4 million; and (c) taking both of these steps would result in annual cash savings of $4.1 million, annual expense reductions of $9.4 million, and a reduction in accrued balance sheet liabilities of $72.4 million.  Embarq changed retiree life insurance benefits in 2007 in part to achieve these projected cost savings.[149]

---

[149] Plaintiffs attempt to controvert several of Defendants' facts relating to its decision to reduce benefits by objecting that Randall Parker's affidavit contains "self-serving and conclusory statements." They do not, however, dispute that Parker has personal knowledge of the facts, and they do not present any evidence controverting Parker's assertions. Instead, Plaintiffs merely contend that inferences should be drawn in their favor. Although inferences are to be drawn in Plaintiffs' favor, Plaintiffs must present specific evidence to demonstrate that a statement is genuinely disputed. For that reason, the Court deems several of Defendants' facts uncontroverted although Plaintiffs attempt to

EBC was also provided with data from a Watson Wyatt 2005-2006 Benefits Database of 1,150 companies.  This data showed: (a) 73% of all companies, and 85% of non-manufacturing companies, provided no life insurance benefits to retirees; and (b) of the companies that provided life insurance benefits, 45% of all companies and 31% of non-manufacturing companies provided coverage of $10,000 or less.

At this meeting on June 27, EBC voted to eliminate company-sponsored basic life insurance for retirees who were participants in the CT&T VEBA plan effective September 1, 2007.  Although company-sponsored basic life insurance benefits for VEBA retirees were eliminated, those retirees still receive a company-provided death benefit, an amount that equals the retiree's final annual salary, or one year of wages.  EBC also voted to reduce the maximum amount of basic life insurance coverage to $10,000 for non-VEBA participating retirees effective January 1, 2008.  Embarq made the announcement on July 26, 2007.

The market for purchasing life insurance is inherently more costly for older persons than younger persons because life expectancy is a function of age.  None of the approximate 8,000 ADEA Plaintiffs have purchased insurance to replace the life insurance that Embarq reduced or eliminated.

## C. Defendants' Motion for Summary Judgment on Plaintiffs' Age Discrimination Claims (Doc. 329)

Plaintiffs allege that Defendants discriminated against them when they reduced or eliminated retiree life insurance benefits because that action disparately impacted older retirees more harshly than younger retirees.  Plaintiffs contend that the amount that they will have to pay in premiums to

---

controvert these facts.

replace the reduced or terminated life insurance benefits are significantly greater than it is for those who are ten years younger.

Defendants argue that they are entitled to summary judgment on Plaintiffs' ADEA and state law age discrimination claims for four reasons: (1) Plaintiffs' disparate impact claim is not cognizable; (2) even if Plaintiffs' claim is cognizable, it fails because Plaintiffs cannot establish a prima facie case of disparate impact; (3) even if Plaintiffs could establish that Defendants' action disparately impacted class members, Defendants took the action based on "reasonable factors other than age"; and (4) the ADEA's equal cost/equal benefit safe harbor applies to Defendants' decision. Although Defendants present numerous arguments as to why they are entitled to summary judgment, the Court will only address those arguments that the Court finds most meritorious.

## 1.  Plaintiffs Cannot Establish a Prima Facie Case

Disparate impact claims are cognizable under the ADEA.[150]  The scope of disparate impact liability under the ADEA, however, is narrower than under Title VII.[151]  Disparate impact claims involve "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another."[152]  "To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group."[153]

---

[150] *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005).

[151] *Id.* at 240; *see also Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1200 (10th Cir. 2006) (noting that the "reasonable factor other than age" defense in the ADEA "significantly limits an employer's potential liability for disparate impact under ADEA.").

[152] *Smith*, 544 U.S. at 239 (quoting *Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977)).

[153] *Pippin*, 440 F.3d at 1200 (quoting *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991)).

Plaintiffs fail to establish a prima facie case because they do not present any relevant statistical evidence. "Statistical evidence is an acceptable, and common, means of proving disparate impact. The statistics must, however, relate to the proper population. For example, when the claim is disparate impact in hiring, the statistics should be based on data with respect to persons qualified for the job."[154]

In this case, Plaintiffs attempt to demonstrate a disparate impact by comparing the impact on persons within the protected group (*i.e.*, age 40 and above) to the impact on hypothetical persons who are also within the protected group (*i.e.*, age 40 and above). Specifically, Plaintiffs compare their actual selves with younger versions of themselves.[155] This comparison, however, does not have any significance in determining whether Defendant's decision to reduce or eliminate life insurance had a disparate impact on the class members because Plaintiffs do not identify appropriate comparators. Plaintiffs do not direct the Court to, and the Court is unable to find, any authority allowing a disparate impact claim to be shown by comparing actual individuals affected by the alleged discriminatory practice to hypothetical younger versions of themselves. Thus, Plaintiffs do not provide any relevant statistical evidence.

---

[154] *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006) (citations omitted).

[155] Plaintiffs do not compare whether there was a disparate impact between an actual 70-year old class member and an actual 60-year old class member. Instead, Plaintiffs attempt to compare the impact between the actual 70-year old class member and a younger version of himself (60 years old). Plaintiffs' designated expert, Mr. Terry Long, opined about the present value of lost death benefits for all VEBA and non-VEBA class members. Mr. Long made his calculations by determining the amount of the present value of the lost death benefits versus the comparable value of the lost death benefits had each of the class members been ten years younger. Defendants have a Motion to Exclude Mr. Long's Report and Testimony which will be discussed below. For purposes of this Order, the Court only considers Mr. Long's "comparator" group to make the determination of whether the comparator group is an appropriate one.

Furthermore, as noted above, the disparate impact must fall more harshly on the protected group.[156] Plaintiffs compare themselves to hypothetical individuals *within the same protected group*. To be sure, life insurance premiums increase as an individual ages, but the mere fact that life insurance premiums increase with age does not demonstrate that Defendants' decision to reduce life insurance benefits was discrimination against the protected group on the basis of age. Plaintiffs present no relevant statistical evidence that the impact fell more harshly on the protected group than a non-protected group. Accordingly, Plaintiffs do not establish a prima facie case of disparate impact age discrimination.

## 2. Defendants Demonstrate That They Made Their Decision on Reasonable Factors Other Than Age

Even if Plaintiffs could establish a prima facie case of disparate impact age discrimination, the evidence demonstrates that Defendants' decision to reduce retiree benefits was based on a reasonable factor other than age ("the RFOA defense"). 29 U.S.C. § 623(f)(1) provides that "[i]t shall not be unlawful for an employer . . . to take any action otherwise prohibited under subsection[] (a) . . . where the differentiation is based on reasonable factors other than age . . . ." The RFOA defense is an affirmative one, and Defendants bear the burden of both production and persuasion in showing that the action taken was based on reasonable factors.[157]

---

[156] *See Teamsters*, 431 U.S. at 335 n.15; *see also EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 950-51 (8th Cir. 1999) (refusing to recognize claims involving subgroups in a disparate impact case); *Smith v. Tenn. Valley Auth.*, 1991 WL 11271, at *4 (6th Cir. 1991) (finding that the comparison in a disparate impact case must be between members of the protected class and members of the non-protected class); *Love v. Commack Union Free School Dist.*, 886 F.2d 1364, 1371 (2d Cir. 1989) (requiring plaintiffs to compare the disparate impact between individuals above the age of 40 and individuals under 40 years of age), *abrogated on other grounds*, 42 U.S.C. § 2000e-2(k)(1)(B)(I). *But see Karlo v. Pittsburgh Glass Works, LLC*, __ F. Supp. 2d. __, 2012 WL 1621265, at *6-8 (W.D. Pa. May 9, 2012) (recognizing subgroup claims under the ADEA for disparate impact claims).

[157] *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 101 (2008).

Defendants state that their reason to reduce or eliminate retiree's life insurance benefits was to (1) reduce costs, and (2) align its retiree benefits more closely with those benefits provided by other companies.  Plaintiffs assert three arguments against Defendants' RFOA defense, all of which fail.  First, Plaintiffs argue that Defendants waived this affirmative defense because they failed to plead it with particularity and failed to include it in the Pretrial Order.  Plaintiffs cite to no authority that Defendants must plead the RFOA defense with particularity.[158]  Even if Plaintiffs believed that Defendants' defense was insufficiently pled, they should have raised the issue long ago.[159] Plaintiffs' argument that Defendants did not preserve the defense in the Pretrial Order is similarly baseless.  It is clearly set forth in that Order.[160]  Thus, Plaintiffs' argument that Defendants waived the RFOA defense fails.

Next, Plaintiffs argue that Defendants' decision to reduce or eliminate life insurance benefits is not based on a reasonable factor other than age because Defendants do not produce evidence that its decision was based on "significant cost considerations."  Plaintiffs rely on 29 C.F.R § 1625.10(a)(1) for support, which provides, in part, that reductions in employee benefit plans are permitted "where such reductions are justified by significant cost considerations."  This regulation, however, is inapplicable to Defendants' RFOA defense. 29 C.F.R. § 1625.10 relates to § 623(f)(2)(B) of the ADEA—whether an employer's bona fide employee benefit plan is compliant

---

[158] The Tenth Circuit has not addressed the issue as to whether the *Twombly/Iqbal* standard applies to affirmative defenses.  The District of Kansas, however, has determined that it does not. *See Bennett v. Sprint Nextel Corp.*, 2011 WL 4553055, at *2 (D. Kan. Sept. 29, 2011).

[159] *See* Fed. R. Civ. P. 12(f)(2)(providing that a "court may strike from a pleading an insufficient defense . . . on motion made by a party . . . within 21 days after being served with the pleading.").  Plaintiffs have been on notice of Defendants' ROR defense for years. *See* Defendants' Answer, Doc. 160, p. 42 (asserting that its actions were based on reasonable factors other than age).

[160] *See* Pretrial Order, Doc. 295, pp. 40-41 (setting forth the essential elements of Defendant's sixth affirmative defense, RFOA).

with the ADEA.[161]  It does not address the RFOA provision contained in § 623(f)(1).  Indeed, the RFOA provision is the subject of another EEOC regulation, 29 C.F.R. § 1625.7.[162]  Plaintiffs do not direct the Court to any authority that provides that employers must produce evidence that its decision is justified by "significant cost considerations" when demonstrating the RFOA defense. Instead, as the United States Supreme Court and the Tenth Circuit have noted, the inquiry is based on reasonableness.[163]  Unlike the business necessity test under Title VII, which requires an employer to demonstrate that "there are other ways for the employer to achieve its goals that do not result in a disparate impact, the reasonableness inquiry includes no such requirement."[164]  Imposing a "significant cost consideration" requirement would effectively heighten the inquiry beyond "reasonableness" and make it more akin to the "business necessity" test of Title VII which would be in contravention of the United States Supreme Court's statement that the reasonableness test is not the business necessity test.[165]  Thus, Plaintiffs' contention that Defendants must produce evidence that its decision was based on significant cost considerations is in error.

---

[161] *See* 29 C.F.R. § 1625.10 (discussing costs and benefits of employee benefit plans with respect to section 4(f)(2) of the ADEA). Section 4(f)(2), 29 U.S.C. § 623(f)(2), of the ADEA provides, in part, that it shall not be unlawful for an employer to observe the terms of an employee benefit plan as long as it is compliant with certain requirements.

[162] *See* 29 C.F.R. § 1625.7 (discussing "differentiations based on reasonable factors other than age" as it relates to section 4(f)(1) of the ADEA).  Section 4(f)(1), 29 U.S.C. § 623(f)(1), of the ADEA provides, in part, that it shall not be unlawful for an employer to take any action otherwise prohibited under the ADEA if the differentiation is based on reasonable factors other than age.

[163] *See Meacham*, 554 U.S. at 96 (stating that "[t]he focus of the defense is that the factor relied upon was a 'reasonable' one for the employer to be using."); *see also Pippin*, 440 F.3d at 1200 (noting that the inquiry is on the reasonableness of the action).

[164] *Smith,* 544 U.S. at 243.

[165] *See, e.g., Meacham*, 554 U.S. at 97 (stating that "the business necessity test should have no place in ADEA disparate-impact cases.").

Third, Plaintiffs contend that Defendants fail to meet the standards of 29 C.F.R. § 1625.7. This regulation includes specific considerations that are relevant when determining whether an employer's practice is based on a reasonable factor other than age. Plaintiffs argue that Defendants did not consider any of the factors set forth. Plaintiffs' reliance on this regulation is also in error. Although this regulation relates to the RFOA defense, it only became effective on April 30, 2012. Defendants made the decision to reduce life insurance benefits in June 2007—approximately five years prior to the enactment of the regulation. "[A]dministrative rules will not be construed to have retroactive effect unless their language requires this result."[166] There is no indication in the statute that this regulation should be given retroactive effect. Thus, it is not applicable here.

The appropriate inquiry when determining whether an employer can establish an RFOA defense is the reasonableness of the employer's action. In *Pippin v. Burlington Resources Oil & Gas Co.*, the Tenth Circuit determined that even if the plaintiff had established a prima facie case of disparate impact age discrimination, the defendant was entitled to summary judgment on its RFOA defense.[167] In *Pippin*, the defendant implemented a reduction in force, and the plaintiff was one of the individuals who lost his job.[168] The Tenth Circuit noted that "[c]orporate restructuring, performance-based evaluations, retention decisions based on needed skills, and recruiting concerns are all reasonable business considerations."[169] Thus, the court determined that the defendant had set forth a valid RFOA defense. Although the court did not specifically address cost-cutting measures,

---

[166] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[167] 440 F.3d at 1201.

[168] *Id.*

[169] *Id.*

the court's reasoning that corporate restructuring in a reduction-in-force case is a reasonable factor other than age suggests that it would similarly find cost-saving considerations reasonable. Furthermore, Defendants direct the Court to numerous cases in which courts have granted summary judgment because they have found that reducing business expenses and cost-saving operational considerations were reasonable factors other than age.[170]

Here, Defendants put forth evidence that they needed to reduce costs to remain competitive and maintain profitability. They sought to reduce costs in ways that would not affect their customer service. Defendants projected that the reduction of retiree life insurance costs would result in annual cash savings of approximately $4 million, annual expense reductions of $9.4 million, and a reduction in accrued balance sheet liabilities of $72.4 million. Defendants also put forth evidence that they wanted to align themselves more closely to other companies' retiree life insurance benefit options. Plaintiffs fail to controvert this evidence. The Court finds that Defendants' decision to reduce costs and align their benefits more closely to other companies' benefits is a reasonable factor other than age. Accordingly, the Court finds that Defendants are entitled to summary judgment on the ADEA claim.

---

[170] *Aldridge v. City of Memphis*, 404 F. App'x 29, 41 (6th Cir. Dec. 14, 2010) (upholding district court's grant of summary judgment because the defendant's employment action of "demoting employees of a particular seniority status for cost-saving and operational considerations surely qualifies" as a RFOA defense), *cert. denied,* 131 S. Ct. 2932 (2011); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 405 (6th Cir. 2008) (affirming the district court's order granting summary judgment in favor of defendant for three reasons, one of which determined that the defendant's RFOA defense of lowering employee costs was valid); *Allen v. Sears Roebuck & Co.*, 803 F. Supp. 2d 690, 698 (E.D. Mich. 2011) (granting summary judgment and finding that reducing operating costs by eliminating paid time off and business expense reimbursements was a reasonable factor other than age); *Doyle v. City of Medford*, 2011 WL 4894077, at *4 (D. Or. Oct. 13, 2011) (finding that the evidence demonstrated that defendant's decision "saved hundreds of thousands of dollars and reduced the premiums paid by management employees" and thus was a reasonable factor other than age which entitled the defendant to summary judgment); *Walker v. City of Cabot, Arkansas*, 2008 WL 4816617, at *4 (E.D. Ark. Nov. 4, 2008) (finding that eliminating redundant positions and lowering expenses constituted a valid RFOA defense); *Townsend v. Weyerhaeuser Co.*, 2005 WL 1389197, at *14 (W.D. Wis. June 13, 2005) (discussing that the termination of an employee to eliminate the burden of paying a high salary would be a reasonable factor other than age).

**D. Defendants' Motion to Decertify Collective Action (Doc. 287), Defendants' Motions to Exclude Terry Long and David Crawford Testimony (Docs. 325, 327), Plaintiffs' Motion for Advisory Jury (Doc. 333)**

The Court's resolution of Defendants' summary judgment motion disposes of Plaintiffs' age discrimination claims. Thus, it renders Defendants' Motion to Decertify moot. It also renders Defendants' Motions to Exclude Expert Testimony on the ADEA claims as moot. Finally, because Plaintiffs no longer have their age discrimination claims, the Court denies Plaintiffs' Motion for Advisory Jury as moot.

**E. Plaintiffs' Request for Oral Argument on Defendants' Motions for Summary Judgment (Doc. 392)**

The parties thoroughly briefed the issues with respect to their positions on Plaintiffs' ERISA and ADEA claims. Accordingly, the Court finds it unnecessary to hear oral argument and denies Plaintiffs' Request for Oral Argument.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment on Named Plaintiffs' First and Third Claims for Relief (Doc. 323) is hereby **GRANTED IN PART** and **DENIED IN PART**. It is granted with respect to all named Plaintiffs except Plaintiffs Britt and Clark.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Selected Class Members' First and Third Claims for Relief (Doc. 332) is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Report and Testimony of Professor Gail Stygall (Doc. 321) is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Decertify Class Action (Doc. 285) is hereby **DENIED WITHOUT PREJUDICE TO REFILING**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Plaintiffs' Second Claim for Relief (Breach of Fiduciary Duty) (Doc. 338) is hereby **GRANTED IN PART** and **DENIED IN PART**. It is granted with respect to all named Plaintiffs except Plaintiff Barnes and Plaintiff Dillon.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Plaintiffs' Fourth, Fifth, Sixth, and Seventh Claims for Relief (Age Discrimination Claims) (Doc. 329) is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Decertify Collective Action (Doc. 287) is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Report and Testimony of Terry Long (Doc. 325) is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Report and Testimony of David L. Crawford (Doc. 327) is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Advisory Jury (Doc. 333) is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiffs' Request for Oral Argument on Defendants' Motions for Summary Judgment (Doc. 392) is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated this 14th day of February, 2013.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE